905 A.2d 918

Gene STILP, Appellant

v.

COMMONWEALTH of Pennsylvania, Robert P. Casey, Jr., Treasurer of the Commonwealth of Pennsylvania, Robert C. Jubelirer, President Pro Tempore of the Pennsylvania Senate, John M. Perzel, Speaker of the House of Representatives, Appellees.

The Honorable John W. Herron, Appellant

v.

Commonwealth of Pennsylvania, Robert C. Jubelirer, President Pro Tempore of the Senate of the Commonwealth of Pennsylvania, John M. Perzel, Speaker of the House of Representatives of the Commonwealth of Pennsylvania, Tom Corbett, Attorney General of the Commonwealth of Pennsylvania, Robert P. Casey, Jr., State Treasurer of the Commonwealth of Pennsylvania, Appellees.

The Honorable Charles C. Brown, Jr., the Honorable Frank T. Hazel, the Honorable Robert K. Kunselman, the Honorable Benjamin Lerner, the Honorable William A. Meehan, the Honorable Timothy Patrick O'Reilly, and the Honorable Joseph A. Smyth, Appellants

v.

Commonwealth of Pennsylvania, Robert P. Casey, Jr., State Treasurer of the Commonwealth of Pennsylvania, Appellees

Commonwealth of Pennsylvania, Thomas W. Corbett, Jr., Attorney General, Intervenor.

Supreme Court of Pennsylvania.

Argued April 4, 2006.

Decided Sept. 14, 2006.

Reargument Denied Nov. 8 and 9, 2006.

542

548

Gene Stilp, Appellant pro se in No. 151 MAP 2005.

Mark P. Widoff, Harrisburg, for PA Clean Sweep, Inc. and RocktheCapital.org., appellant amici curiae in No. 151 MAP 2005.

Peter James Speaker, Bret Keisling, Harrisburg, for Thomas, Thomas & Hafer, LLP, appellant amicus curiae in No. 151 MAP 2005.

Calvin R. Koons, Thomas W. Corbett, Gregory R. Neuhauser, John G. Knorr, III, Harrisburg, Amanda L. Smith, for the Com. of PA, appellee in Nos. 151 MAP 2005 and 48 EAP 2005.

Jonathan F. Bloom, Thomas Walter Dymek, C. Clark Hodgson, Jr., John M. Perzel, Leslie Miller Greenspan, Philadelphia, for John M. Perzel, appellee in Nos. 151 MAP 2005 and 48 EAP 2005.

Linda J. Shorey, Robert C. Jubelirer, John P. Krill, Jr., Amy L. Groff, for Robert C. Jubelirer, M.D., appellee in Nos. 151 MAP 2005 and 48 EAP 2005.

Sally Ann Ulrich, Robert P. Casey, for Robert P. Casey, Jr., appellee in Nos. 151 MAP 2005, 48 EAP 2005, 9 MAP 2006.

Kristin M. Hynd, Robert C. Heim, Nory Miller, David Neil Sontag, Kristin Hynd Jones, Benjamin D. Schireson, Philadelphia, for Hon. John W. Herron, appellee amicus curiae in No. 151 MAP 2005 and appellant in No. 48 EAP 2005.

Jane Leslie Dalton, John Jeming Soroko, Matthew Michael Ryan, Philadelphia, for Hon. Charles C. Brown, Jr., et al., appellee amici curiae in No. 151 MAP 2005 and appellant in No. 9 MAP 2006.

Anthony T. McBeth, Robert L. Knupp, Harrisburg, for County Com'rs Ass'n of PA, amicus curiae in No. 48 EAP 2005,

Thomas W. Corbett, Gregory R. Neuhauser, Harrisburg, Amanda L. Smith, for Tom Corbett, appellee in No. 48 EAP 2005.

John Patrick Quinn, H. Robert Fiebach, Gaele M. Barthold, Philadelphia, Thomas G. Wilkinson, Jr., for PA Bar Ass'n, appellant amicus curiae in No. 9 MAP 2006.

Marc J. Sonnenfeld, Timothy D. Mygatt, Thomas V. Ayala, Philadelphia, for Philadelphia Bar Ass'n, appellant amicus curiae in No. 9 MAP 2006.

Gregory R. Neuhauser, Harrisburg, Amanda L. Smith, for the Com. of PA, Atty. Gen., intervenor-appellee in No. 9 MAP 2006.

Before: CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## *OPINION*

Justice CASTILLE.

## I. *FACTS AND PROCEDURAL HISTORY*

### - A -

These matters are before this Court, upon exercise of plenary jurisdiction,[1] based upon the important constitutional

---

1. *See* 42 Pa.C.S. § 726.

questions posed by the parties. The absence of a developed record is no impediment to review of these questions because the cases pose purely legal challenges to two pieces of legislation: Act 44 of 2005,[2] which tied salaries provided to the Judiciary, the General Assembly, and certain high-ranking executive branch officials to the salaries provided to federal officials by means of specific formulas, resulting in increased salaries; and Act 72 of 2005,[3] which repealed Act 44 in its entirety. The factual circumstances giving rise to the litigation are undisputed by the parties. Indeed, the parties assume the Court's familiarity with, and acceptance of, certain foundational facts concerning the interplay between the two Acts and the occasion for Act 72. Thus, in the discussion that follows, and for purposes of background, we will take judicial notice of some of the relevant factual circumstances concerning the legislative process and the legislation itself.

Act 44 was passed by the General Assembly without floor debate at approximately 2:00 a.m. on July 7, 2005. Act 44 was signed into law by Governor Edward G. Rendell on that same date. In its final form, Act 44 was twenty-two pages in length, and it, *inter alia,* removed the issue of official compensation from the political arena by adopting specific formulas for determining compensation for the Judiciary, the General Assembly, and certain high-ranking executive officials, which were based on the federal governmental salary structure. Application of the formulas resulted in compensation increases for all three branches.

There was a negative public response to the legislation, focusing particularly upon its timing and method of passage and upon a provision providing for an increase in unvouchered expenses, which applied exclusively to the legislative branch.[4]

2. The Act of July 7, 2005, P.L. 201, No. 44 (hereinafter, "Act 44").

3. The Act of November 16, 2005, P.L. 385, No. 72 (hereinafter, "Act 72").

4. The Pennsylvania Constitution provides that legislators may not receive an increase in salary or mileage during the term of office for which they have been elected under a law passed during such term of office. Pa. Const art. II, § 8. Act 44 adopted a formula that increased salaries for legislators, but those higher salaries were not to take effect

Governor Rendell defended the legislation, and specifically defended the unvouchered expense provision, noting: "It's legal—and that's all I'm going to say about it."[5] Mr. Chief Justice Cappy, acting in his role as the leader of the Pennsylvania Judiciary,[6] later authored two editorials for legal periodicals that defended Act 44. *See* Ralph J. Cappy, *Three Branches, Working Together: A collaborative effort has led to a compensation system that is right for Pennsylvania,* PA. LAW WEEKLY, July 25, 2005; Ralph J. Cappy, *Legislature Has Found a Compensation Plan That's Right for Pa.,* THE LEGAL INTELLIGENCER, July 27, 2005. In these editorials, the Chief Justice posited that Act 44 established a salary structure which was beneficial for good government by attracting and retaining qualified public servants. Moreover, the Chief Justice noted that, by linking the salaries paid to state officials to the federal governmental salary structure, Act 44 addressed the problem of political distraction generally associated with the mere consideration of pay raise legislation. The Chief Justice did not address the unvouchered expense provision applicable to the members of the General Assembly.[7]

The year 2005 was a municipal election year.[8] Thus, in the November 8, 2005 general election, no statewide offices were contested in either the legislative or the executive branch. However, pursuant to Article V, Section 13(a) of the Pennsylvania Constitution, which requires that all judges be elected at

until after each legislator was either elected or reelected for an additional term of office. The unvouchered expense provision, however, permitted current legislators to obtain the dollar-for-dollar equivalent of that future salary increase· immediately through the provision of an increase in unvouchered expenses. *See* Act 44, § 2 (amending 46 Pa.C.S. § 1107).

5. Amy Worden and Mario F. Cattabiani, *In a late-night flurry, the budget is passed; The $23.9 billion package restores Medicaid cuts, adds an environmental bond—and included a legislative pay raise,* PHILA. INQUIRER, July 7, 2005, at B1.

6. The Pennsylvania Supreme Court is the "highest court of the Commonwealth and in this court shall be reposed the supreme judicial power of the Commonwealth." PA. CONST. art. V, § 2.

7. The Chief Justice is not participating in these cases.

8. Article VII, Section 3 of the Pennsylvania Constitution mandates that municipal elections be held in odd-number years.

municipal elections, two of this Court's Justices, Mr. Justice Russell M. Nigro and Madame Justice Sandra Schultz Newman, stood for retention election.[9] Mr. Justice Nigro was narrowly defeated for retention in the general election, while Madame Justice Newman was retained by an unusually narrow margin.

In the meantime, as the general election neared, the General Assembly began considering a repeal of Act 44 in apparent reaction to the public outcry. Thus, competing bills that would eventually become Act 72 were introduced in both the Senate and the House of Representatives. A dispute between the two chambers stymied passage of the legislation before the general election took place. Following the November 8, 2005 election, however, the House of Representatives approved Act 72 on November 14, 2005; the Senate followed suit on November 16, 2005; and the Governor signed Act 72 into law on that same date. Act 72 on its face repealed Act 44 in its entirety.

### - B -

Currently before the Court are three separate matters. The first matter in order of time, *Stilp v. Commonwealth,* arose on August 1, 2005, when appellant Gene Stilp, acting *pro se,* filed a Complaint in Mandamus and Bill of Equity in the Commonwealth Court's original jurisdiction, challenging the constitutionality of Act 44. The respondents [10] filed preliminary objections; Stilp filed an amended Complaint; and respondents renewed their preliminary objections. While those preliminary objections were pending, Act 72 was adopted as

9. Justice Nigro and Justice Newman were elected to this Court at the municipal election held in November 1995. Under Article V, Section 15(a) of our Constitution, the term of office for Justices of this Court is ten years. Pursuant to Article VII, Section 15(b), a Justice may seek retention following expiration of that ten-year term.

10. The respondents in the Commonwealth Court are the same as appellees here, except for Governor Rendell who was dismissed as an appellee via *per curiam* order dated February 14, 2006. Appellees consist of the Commonwealth, State Treasurer Robert P. Casey, Jr., President *pro tempore* of the Senate Robert C. Jubelirer, and Speaker of the House John M. Perzel.

554

law. On November 17, 2005, the Commonwealth Court stayed briefing on the preliminary objections and directed the parties to file memoranda of law on the issue of whether the case had been rendered moot by Act 72's repeal of Act 44. On November 23, 2005, simultaneously with his Commonwealth Court submissions addressing mootness and a motion to stay the proceedings, Stilp filed an Application for Extraordinary Relief in this Court under Pa.R.A.P. 3309 requesting, *inter alia,* that we assume jurisdiction over the matter. Stilp also requested a stay of the Commonwealth Court proceedings. On November 30, 2005, the Commonwealth Court, in an unpublished, single-judge opinion by the Honorable James R. Kelley, dismissed Stilp's challenge below on the basis of mootness and denied his request for a stay, noting that Stilp could appeal the dismissal to this Court as a matter of right. On December 22, 2005, this Court granted Stilp's Application in part, assumed plenary jurisdiction over this matter, directed that the case be listed for oral argument at the same session with *Herron v. Commonwealth,* directed that the parties brief five issues that will be discussed later in this Opinion, and denied Stilp's motion to stay the Commonwealth Court proceedings as moot. *See Stilp v. Commonwealth,* 585 Pa. 543, 889 A.2d 499 (2005) (per curiam).

Stilp and appellees thereafter timely filed legal briefs addressing the relevant issues.[11] Each appellee submitted a separate brief but, with the exception of Treasurer Casey, presented similar arguments for each issue. Treasurer Casey,

11. Attorney General Tom Corbett submitted briefs on behalf of the Commonwealth in *Stilp* and *Brown,* and on behalf of himself and the Commonwealth in *Herron.* In his *Herron* brief, but not his *Brown* brief, the Attorney General contends that, because Act 72 does not give him any authority to enforce the law, he is not a proper party and should be dismissed. We deem the participation of the Attorney General to be appropriate, not to mention helpful, as he is the Commonwealth official statutorily charged with defending the constitutionality of all enactments passed by the General Assembly, regardless of the nature of the constitutional challenge or the opinion of any other state official concerning a given statute's validity. *City of Philadelphia v. Commonwealth,* 575 Pa. 542, 838 A.2d 566, 583–84 (2003) (citing 71 P.S. § 732–204(a)(3) ("It shall be the duty of the Attorney General to uphold and defend the constitutionality of all statutes. . . .")).

instead, aligned his arguments with Stilp and argued that Act 44 was unconstitutional. Several interested parties filed *amicus curiae* briefs in this matter. In support of Stilp, a single *amicus curiae* brief was filed by Timothy Potts; Russ Diamond, on behalf of PA Clean Sweep, Inc.; and Eric Epstein, Coordinator of RocktheCapital.org. In support of appellees, *amicus curiae* briefs were filed by Judge Herron, the appellant in *Herron v. Commonwealth*, and the judges/appellants in *Brown v. Commonwealth*. Additionally, an *amicus curiae* brief was submitted by the law firm of Thomas, Thomas & Hafer, LLP, which did not support either party but addressed one of the issues presented.

The second matter in order of time, *Herron v. Commonwealth*, was instituted on December 6, 2005 when the Honorable John W. Herron, Judge of the Court of Common Pleas of Philadelphia County, filed a Petition for Review in the Commonwealth Court challenging the constitutionality of Act 72 insofar as it decreased the compensation of Pennsylvania judicial officials. On that same date, Judge Herron filed an Application for Extraordinary Relief, in accordance with Pa. R.A.P. 3309, requesting, *inter alia*, that this Court assume extraordinary jurisdiction, pursuant to 42 Pa.C.S. § 726, over the Commonwealth Court matter. On December 22, 2005, this Court granted Judge Herron's Application in part, assumed plenary jurisdiction, directed that the case be listed for oral argument at the same session with *Stilp*, and directed that the parties brief two issues that will be fully discussed later in this Opinion.[12, 13]

12. Appellees in *Herron* consist of the Commonwealth, Senate President *pro tempore* Jubelirer, Speaker of the House Perzel, Attorney General Corbett, and Treasurer Casey. Governor Rendell was dismissed as an appellee via *per curiam* order dated February 14, 2006, and Lieutenant Governor Catherine Baker Knoll was dismissed as an appellee via *per curiam* order dated February 21, 2006.

13. The requests for this Court to assume jurisdiction over *Stilp* and *Herron* were overlapping, and it became apparent to this Court that the cases posed interlocking issues. Accordingly, joining the matters and listing them for argument together assured a full and complete consideration of the important legal issues raised in each case.

Judge Herron and appellees timely submitted briefs. As in *Stilp,* each appellee submitted an individual brief, and each appellee defends Act 72's constitutionality. An *amicus curiae* brief was submitted by the County Commissioners Association of Pennsylvania ("CCAP") supporting neither party. CCAP takes no position with respect to the constitutionality of Act 72; rather, CCAP's concern relates to Judge Herron's challenge and Act 44's effect on the salary structure for full-time county district attorneys.[14]

The third matter in order of time, *Brown v. Commonwealth,* was initiated on December 13, 2005 when appellants, who are commissioned judges in either the Court of Common Pleas in various counties in the Commonwealth or in the Philadelphia Municipal Court,[15] filed a Petition for Review in the Commonwealth Court also challenging the constitutionality of Act 72. On that same date, the Brown appellants filed an Application for Extraordinary Relief, in accordance with Pa.R.A.P. 3309, requesting, *inter alia,* that this Court assume extraordinary jurisdiction over the Commonwealth Court matter pursuant to 42 Pa.C.S. § 726. On January 11, 2006, this Court granted the Application in part, assumed plenary jurisdiction, consolidated the case with *Herron,* directed that the case be listed for oral argument at the same session with *Stilp* and *Herron,* and further directed that the parties brief the same two issues posed in *Herron.*

14. We note that the concern raised by CCAP is not before this Court, as we did not order the parties to discuss the interaction of Act 44's provision regarding district attorney salaries and Judge Herron's challenge, nor did the parties raise this issue themselves. Accordingly, there will be no further discussion of this issue in this Opinion. *See Commonwealth v. Cotto,* 562 Pa. 32, 753 A.2d 217, 224 n. 6 ("An *amicus curiae* is not a party and cannot raise issues that have not been preserved by the parties."); Pa.R.A.P. 531(a) (an interested party may file an *amicus curiae* brief concerning those questions before an appellate court); 4 AM.JUR.2D *Amicus* § 7 (2005) ("[A]n amicus must accept the case before the court with the issues made by the parties. Accordingly, an amicus curiae ordinarily cannot inject new issues into a case which have not been presented by the parties.") (footnotes omitted).

15. The seven judges/appellants have filed a single brief; for ease and clarity of discussion, we will refer to them collectively as "the Brown appellants."

The Brown appellants and appellees timely submitted briefs.[16] Both Attorney General Corbett and Treasurer Casey posit arguments that are materially identical to those they presented in *Herron*. The Pennsylvania Bar Association and the Philadelphia Bar Association filed separate *amicus curiae* briefs arguing in support of the Brown appellants and against Act 72's constitutionality insofar as it reduced judicial compensation. Senator Jubelirer submitted an *amicus curiae* brief in support of appellees, arguing that Act 72 was constitutional.

The matters were argued before the Court on April 4, 2006, with able and respectful presentations forwarded by all involved, and they are ripe for decision. Because of the interplay of the challenges to the two Acts in question, we have determined that a single opinion would be the most efficient and sensible manner of deciding the entirety of the issues. Part II of this Opinion addresses the challenges to the constitutionality of Act 72 raised by Judge Herron and the Brown appellants, while Part III addresses Stilp's challenges to the constitutionality of Act 44.

### - C -

Preliminarily, we note that none of the parties has questioned the propriety of this Court's consideration of these matters. The six participating members of this Court are not parties to these actions. However, the Justices, and indeed every member of the Judiciary in Pennsylvania, have a pecuniary interest in the outcome of these proceedings. The pecuniary interest implicated here would ordinarily require a judge to disqualify himself or herself from the matter. That option, however, is not available here as recusals *en masse* would prevent any judicial review whatsoever of these important matters. Thus, under the present circumstance, the long-recognized common law "rule of necessity" requires this Court to proceed to discharge its constitutional duty notwithstanding any interest in the outcome. *See United States v. Will*, 449

16. Appellees consist of the Commonwealth, Governor Rendell, and Treasurer Casey. Governor Rendell did not submit a brief in this matter.

U.S. 200, 213–16, 101 S.Ct. 471, 480–81, 66 L.Ed.2d 392 (1980); *City of Philadelphia v. Fox*, 64 Pa. 169, 185 (1870) ("The true rule unquestionably is that wherever it becomes necessary for a judge to sit even where he has an interest—where no provision is made for calling another in, or where no one else can take his place—it is his duty to hear and decide, however disagreeable it may be."). Indeed, this Court previously has considered constitutional challenges to legislation affecting judicial compensation. *See, e.g., Consumer Party of Pennsylvania v. Commonwealth*, 510 Pa. 158, 507 A.2d 323 (1986). Since there is no provision or procedure in existence for an entity clothed with proper jurisdiction to consider this matter other than this Court, we shall proceed to consider the claims.

## II. CONSTITUTIONALITY OF ACT 72 INSOFAR AS IT REDUCES JUDICIAL COMPENSATION: THE HERRON AND BROWN APPEALS

### A. Introduction

The title of Act 72 plainly states that this Act was passed for the purpose of repealing Act 44 in its entirety and reenacting the previous compensation provisions contained in Act 39 of 1983,[17] and making editorial changes.[18] Judge Herron and the Brown appellants (collectively, "the Judges") challenge Act

17. The Act of September 30 1983, P.L. 160, No. 39 (hereinafter, "Act 39").

18. Specifically, the title of Act 72 provides in full:

A[n] A[ct] [r]epealing the act of July 7, 2005 (P.L. 201, No. 44), entitled, "An act amending Titles 42 (Judiciary and Judicial Procedure), 46 (Legislature) and 71 (State Government) of the Pennsylvania Consolidated Statutes, providing for compensation; and making an inconsistent repeal"; reenacting and amending the act of September 30, 1983 (P.L. 160, No. 39), entitled "An act establishing salaries and compensation of certain public officials including justices and judges of Statewide courts, judges of courts of common pleas, judges of the Philadelphia Municipal Court, judges of the Philadelphia Traffic Court, district justices and the Governor, the Lieutenant Governor, the State Treasurer, the Auditor General, the Attorney General and certain other State officers and the salary and certain expenses of the members of the General Assembly; and repealing certain inconsistent acts," and further providing for members of the General Assembly; and making editorial changes.

72 insofar as it repeals the formula in Act 44 which led to an increase in the compensation provided to the Judiciary. The Judges' challenge focuses on Article V, Section 16(a) of the Pennsylvania Constitution, which provides in full:

Justices, judges and justices of the peace [now magisterial district judges] shall be compensated by the Commonwealth as provided by law. Their compensation shall not be diminished during their terms of office, unless by law applying generally to all salaried officers of the Commonwealth.

PA. CONST. art. V, § 16(a). The General Assembly obviously realized that its repeal of Act 44 presented a serious constitutional question to the extent that it reduced judicial compensation. Thus, the very first section of Act 72, entitled "Declaration of policy," provides in full, as follows:

(a) The General Assembly declares that the reenactment of the superseded provisions of the act of September 30, 1983 (P.L. 160, No. 39), known as the Public Official Compensation Law, is necessary to effectuate the repeal of the act of July 7, 2005 (P.L. 201, No. 44), entitled "An act amending Titles 42 (Judiciary and Judicial Procedure)[,] 46 (Legislature) and 71 (State Government) of the Pennsylvania Consolidated Statutes, providing for compensation; and making an inconsistent repeal," and to adopt salaries in effect on July 6, 2005.

(b) The exercise of the authority of the General Assembly to establish salary of the justices, judges and justices of the peace pursuant to section 1 of Article II and section 16(a) of Article V of the Constitution of Pennsylvania is not intended to diminish or infringe on, or otherwise interfere with, the independence of the judicial system or the Executive Department.

(c) For purposes of implementing this act and restoring salaries in effect on July 6, 2005, the General Assembly finds and declares that the officials referred to in this act shall constitute the "salaried officers of the Commonwealth"

for purposes of section 16(a) of Article V of the Constitution of Pennsylvania.

Act 72, § 1.

In light of the Judges' challenge, this Court directed the parties to address the following two issues:

(1) Whether Act 72 violates Article V, Section 16(a) of the Pennsylvania Constitution?

(2) What is the significance of Sections 1(b) and (c) of Act 72 to the question of the constitutionality of Act 72 in the face of a challenge under Article V, Section 16(a) of the Pennsylvania Constitution?

Because this Court assumed plenary jurisdiction over this matter, there is no lower court decision or order under review. The questions involved are purely legal, and thus, our scope of review is plenary and our standard of review is *de novo*.

## B. Arguments in Support of Act 72's Unconstitutionality

Though not identical, the arguments forwarded by the Judges are similar and overlapping; accordingly, for ease of exposition, we shall summarize them as one. The Judges argue that Act 72's repeal of the Act 44 formula, a formula which led to an immediate increase in the compensation provided to the Judiciary, diminished judicial compensation during their terms of office, and that the single exceptional circumstance recognized by the Constitution which would allow for such reduction—*i.e.*, where the compensation for "all salaried officers of the Commonwealth" is also diminished—is not implicated here. The Judges argue that the constitutional exception was intended only for a circumstance where governmental solvency is threatened in "a period of economic stress." *See* Preparatory Committee's Reference Manual No. 5, *The Judiciary*, at 67.[19] Thus, the Judges contend, the Pennsylva-

19. Section 16(a) was proposed by the Pennsylvania Bar Association during the 1967–1968 Pennsylvania Constitutional Convention. The proposal was based on similar provisions contained in the Constitutions of 1790, 1834, and 1870, each of which explicitly prohibited diminution of the compensation paid to judges during their terms of office. The Pennsylvania Bar Association also recommended that the constitutional provision should contain the exception that judicial compensation could

nia Constitution sets a high bar before judicial compensation may be reduced, limited to a specific, extraordinary circumstance. If that circumstance is not implicated, the unambiguous prohibition against reducing judicial compensation is necessary to ensure the independence of the Judiciary, one of the three coordinate and equal branches of government. *See, e.g., Firing v. Kephart*, 466 Pa. 560, 353 A.2d 833, 837 (1976) ("[T]he well-established purpose of the prohibition against diminishing the compensation of the Judiciary during their terms of office, contained in Section 16(a) but explicitly or implicitly present in the Pennsylvania Constitution since the Constitution of 1790, is to maintain the independence of the Judiciary from encroachment by the other branches of government.") (footnote omitted).

The Judges' argument that Act 72 diminished judicial compensation is straightforward. Act 44's formula operated to immediately increase the compensation paid all Pennsylvania judges; Pennsylvania judges actually began receiving the new salaries as of July 8, 2005; the General Assembly reduced those salaries during the judges' terms of office four months later with the November 16, 2005 enactment of Act 72; and, after November 16, 2005, Pennsylvania judges' salaries in fact were rolled back to their previous levels.

Turning to the question of the applicability of the Section 16(a) exception, the Judges first note that Act 72 was not passed in order to address any particular economic crisis in the Commonwealth, which might have warranted a reduction in the compensation of "all salaried officers of the Commonwealth." The Judges note that the period between July 2005 and November 2005 was not marred by severe economic stress threatening the Commonwealth. Instead, they assert that Act 72 was motivated by a **political** crisis facing the

be reduced only if all compensation of salaried officers of the Commonwealth was diminished, similarly for the purpose of alleviating the Commonwealth's financial burden during exigent economic circumstances. *See* Preparatory Committee's Reference Manual No. 5, *The Judiciary* at 67. For a generation that experienced the Great Depression and the Second World War, this was not an ephemeral or obscure prospect.

General Assembly in the wake of their constituents' reactions to certain aspects of Act 44. Leaving aside whether the purpose of the legislation implicates the Section 16(a) exception, the Judges then posit three independent reasons why Act 72 does not fall within the narrow exception provided in Section 16(a).

First, the Judges argue that Act 72 does not diminish, or even address, the compensation of many other "salaried officers of the Commonwealth." The Judges concede that the specific constitutional phrase "salaried officers of the Commonwealth" has not been addressed or defined by any court in this Commonwealth, but the Judges cite to other precedent from this Court in support of their assertion that a reliable definition is easily discernible. *See Werner v. Zazyczny,* 545 Pa. 570, 681 A.2d 1331, 1337 (1996) (determining that Special Investigator III in Inspector General's Office was not an "officer" under Article VI, Section 7 of Pennsylvania Constitution, and explaining that "[a] person will be deemed a public officer if the person is appointed or elected to perform duties of a grave and important character, and which involve some of the functions of government, for a definite term."); *Vega v. Borough of Burgettstown,* 394 Pa. 406, 147 A.2d 620, 623 (1958) (concluding that police chief was not "public officer" but merely a "public employee" under a statute outlining the procedure for the removal of borough police officers, and noting that "the test to be applied in determining a public officer is . . . [whether] the officer is chosen by the electorate, or appointed, for a definite and certain tenure in the manner provided by law to an office whose duties are of a grave and important character, involving some of the functions of government, and are to be exercised for the benefit of the public for a fixed compensation paid out of the public treasury . . . .") (quoting *Alworth v. County of Lackawanna,* 85 Pa.Super. 349, 352 (1925)); *Richie v. City of Philadelphia,* 225 Pa. 511, 74 A. 430, 431 (1909) (determining that term "public officer" in Article III, Section 13 of then-applicable Pennsylvania Constitution encompassed appointed real estate assessor; factors to be examined are "the nature of the service to be performed by

the incumbent," the "duties imposed upon him," whether "those duties are of a grave and important character, involving in the proper performance of them some of the functions of government," and "a fixed term.").[20] The Judges further argue that other provisions of the Pennsylvania Constitution containing the term "officer" make clear that the term is intended to be broad and inclusive; for that reason, the Judges submit, the Constitution contemplates "officers" beyond those explicitly named. *See, e.g.*, PA. CONST. art. VI, § 1 (entitled "Selection of Officers Not Otherwise Provided for in Constitution," and providing, "All officers, whose selection is not provided for in this Constitution, shall be elected or appointed as may be directed by law.").

The Judges additionally note that Section 16(a) adds two important qualifications that must be accounted for when discerning a proper definition for the term "officer." First, the "officers" must be "salaried;" and second, they must be officers "of the Commonwealth." Therefore, the Judges cogently reason that the term "officer" in Article V, Section 16(a) "refers to all *salaried* holders of *state* offices, whether elected or appointed to those posts, whose offices impose grave and important duties and involve performance of some functions of government." Brown Brief at 13; Herron Brief at 7.

Applying this logical definition, the Judges argue that no less than seven cabinet positions in the executive branch did not suffer a reduction in compensation by operation of Act 72,

**20.** The Judges note that, although this Court has often stated that a defined term of office is a relevant factor in determining whether someone is an "officer," the Court has never specifically held that this factor is an absolute prerequisite. The Judges further note, however, that in 1978, the Office of the Attorney General issued an official opinion concluding that the Attorney General himself and the Secretary of the Commonwealth were "officers" under the Constitution even though neither position at that time carried a definite term. *See* Pa. Op. Att'y Gen. 110 (1978), 1978 WL 21499. The Judges ultimately maintain that this Court does not need to resolve this issue because Act 72 plainly failed to address or diminish the compensation of holders of many offices charged with performing grave and important duties who are appointed or elected for definite terms, and that fact is enough to decide their challenge.

including: the General Counsel, *see* 71 P.S. § 732–301; the Secretary of Planning and Policy; the Secretary of Legislative Affairs; the Director of Health Care Reform; the Director of the Pennsylvania Emergency Management Agency, *see* 35 Pa.C.S. § 7312(e); the Secretary of the Budget, *see* 71 P.S. § 229; and the Inspector General, *see* 4 Pa.Code § 1.291. The Judges contend that cabinet-level officers certainly must qualify as "salaried officers of the Commonwealth." In this regard, and as an example, Judge Herron notes that "the General Counsel is an officer established by statute to undertake the grave and important role of serving as the legal advisor to the Governor and '[r]ender such legal advice, and such representation prior to initiation of any action, as are required concerning every matter and issue arising in connection with the exercise of the official powers and duties' of each executive and independent agency." Herron Brief at 8 (quoting 71 P.S. § 732–301(3)).

Additionally, the Judges contend that Act 72 did not reduce the salaries of the following officers, all of whom are appointed by the Governor, by and with the consent of the Pennsylvania Senate: the members of the Turnpike Commission, *see* 36 P.S. § 651.5; the members of the Unemployment Compensation Board, *see* 43 P.S. § 763; the members of the Pennsylvania Public Utility Commission, *see* 66 P.S. § 301; the members of the Pennsylvania Securities Commission, *see* 70 P.S. § 1–601; the members of the State Civil Service Commission, *see* 71 P.S. § 741.201; the Physician General, *see* 71 P.S. § 1401; the members of the Environmental Hearing Board, *see* 35 P.S. §§ 7511–16; the Commissioner of the Bureau of Professional and Occupational Affairs, *see* 63 P.S. § 1401–305; and the Consumer Advocate, *see* 1976 Pa. Legis. Serv. 423 (West). Other "officers" who did not have their salaries reduced by Act 72, the Judges note, include: the State Fire Commissioner; the Deputy Secretaries of Community Affairs and Development, Information Technology, and Human Resources and Management; and the Executive Directors of the Game Commission, the Philadelphia Regional Port Authority, the Penn-

sylvania Historical and Museum Commission, and the Fish and Boat Commission.

The Judges conclude their first point by emphasizing that the list of "officers" they have identified above is not exhaustive of all such unaffected "salaried officers of the Commonwealth." But the list alone, the Judges assert, proves that Act 72 did not diminish or even address the compensation of "all" salaried officers of the Commonwealth in the same manner that it directly diminished judicial compensation. The Judges assert that, for this reason alone, the exception in Section 16(a) does not apply, and Act 72 therefore violates Article V, Section 16(a).

The second independent reason for concluding that the exception does not apply, according to the Judges, is that Act 72 does not diminish the current salaries of the executive officers who were specifically enumerated in Act 44. The elected executive officers identified in Act 44, whose increased compensation was specifically addressed in Act 44, include the Governor, the Lieutenant Governor, the State Treasurer, the Auditor General, and the Attorney General. Act 44, § 3 (amending 71 Pa.C.S. §§ 1102–03). The appointed Cabinet members identified and affected by Act 44 were the Adjutant General, the Secretary of Aging, the Secretary of Agriculture, the Secretary of Banking, the Secretary of the Commonwealth, the Secretary of Community and Economic Development, the Secretary of Conservation and Natural Resources, the Secretary of Correction, the Secretary of Education, the Secretary of Environmental Protection, the Secretary of General Services, the Secretary of Health, the Insurance Commissioner of the Commonwealth, the Secretary of Labor and Industry, the Secretary of Public Welfare, the Secretary of Revenue, the Pennsylvania State Police Commissioner, and the Secretary of Transportation. *Id.* (amending 71 Pa.C.S. § 1102(c)).

Under Act 44, the Judges note, the salary increases applicable to the named elected executive positions were only available to those individuals elected to these positions after the July 7, 2005 effective date of the Act. *See* Act 44, § 4(4).

Similarly, the salary increases provided for the named appointed Cabinet positions were to apply only to individuals appointed to these positions after December 31, 2006. *See* Act 44, § 4(3). Unlike the compensation increases that the Act 44 formulas provided to the legislators (in the form of unvouchered expenses) and the Judiciary, the increases in salaries provided to these named executive officers never took effect because Act 44 was repealed by Act 72 before any of these officers were either elected or appointed. Because **no** executive officers—including the ones specifically identified in Act 44—had their compensation actually increased by Act 44, by definition, none saw their salaries decreased when Act 72 was adopted. For this separate and independent reason, the Judges argue, the Section 16(a) "all salaried officers" exception does not apply, and Act 72 must be deemed unconstitutional insofar as it reduced judicial compensation.

Third, the Judges argue that the exception is inapplicable because the Act 72 salary reduction does not apply "generally." This is so, the Judges note, because the salary reductions in Act 72 do not apply evenly—*i.e.*, by the same amount or proportion—to the various officers affected, as some officers' salaries are reduced by one amount, others by a different amount, etc. The Judges dismiss appellees' argument that Act 72 merely reduces salaries by the same amount that they were increased by Act 44 as unavailing, reiterating that the constitutional provision addresses reductions alone and it makes clear that, once salaries have been established at a certain amount, a law reducing those salaries does not apply "generally" unless it reduces them evenly across-the-board, either directly or proportionately.

Turning to the second issue in this Court's briefing order, the Judges argue that the General Assembly's policy declarations contained in Sections 1(b) and (c) of Act 72 may reflect a legislative awareness of the obvious Section 16(a) dilemma, but the declarations themselves do not dissipate the direct and patently unconstitutional effect that the Act has on reducing judicial compensation. Regarding Section 1(b)'s declaration that Act 72 "was not intended to diminish or infringe on, or

otherwise interfere with, the independence of the judicial system," the Judges assert that this is not the relevant constitutional test. To the contrary, the Judges note, the test is specifically set forth in Section 16(a) itself, and it looks to whether judicial compensation has been diminished by a law that does not apply generally to "all salaried officers of the Commonwealth." That test does not include an exception for instances where the reduction in judicial compensation ordered by the General Assembly was accompanied by a legislative declaration that it did not intend the reduction to interfere with the independence of the Judiciary; and this Court has never held that a statute diminishing judicial compensation survives constitutional scrutiny where the General Assembly claims that it did not thereby intend to interfere with the independence of the Judiciary. *See, e.g., Catania v. Commonwealth, State Employees' Ret. Bd.,* 498 Pa. 684, 450 A.2d 1342 (1982) (plurality opinion).

As for the General Assembly's policy declaration in Section 1(c) of Act 72, which purports to define the constitutional term "salaried officers of the Commonwealth" solely for purposes of this Act and rolling back compensation levels, the Judges argue that this declaration likewise does not bind the Court. In the Judges' view, the Constitution does not afford the General Assembly the authority to attempt to define away a violation of Section 16(a). To grant the General Assembly the ability to do so, the Judges contend, would eliminate the Constitution's authority to impose limitations or prohibitions on the legislative branch, in clear contravention of fundamental separation of powers principles. Further, the Judges note that the General Assembly's declaration as to which officers constitute the "salaried officers of the Commonwealth" is inconsistent with: prior decisions of this Court interpreting the term "officer," *see, e.g., Werner, supra;* the Constitution's considerable guidance in determining who is an "officer," *see, e.g.,* PA. CONST. art. IV, § 1, art. VI, § 1; and the General Assembly's own prior positions on this issue—most tellingly, the revived Act 39 itself, the title of which plainly acknowledged that it did not establish new salaries for every Com-

monwealth officer, as it employed the terms "certain public officials" and "certain other State officers." Thus, the Judges argue, this Court is not bound by the General Assembly's attempted pre-emptive definition.

The *amicus* briefs filed by the Pennsylvania Bar Association and the Philadelphia Bar Association emphasize, as the Judges do, that Act 72 violates Section 16(a) because it does not apply to "all salaried officers of the Commonwealth" as that phrase was intended, and because many executive branch officers specifically mentioned in Act 44 itself did not have their existing salaries at all diminished by Act 72. The *amici* also assert that the General Assembly's declarations in Sections 1(b) and (c) of Act 72 fail to save the Act from its patently unconstitutional effect upon judicial salaries. Indeed, the Philadelphia Bar Association argues that the General Assembly, in seeking to bind the courts to a one-time definition of the term "salaried officers of the Commonwealth," a definition which was obviously designed only in the hope of insulating Act 72 against a constitutional challenge, sought to usurp the function of the Judiciary as the ultimate interpreter of the Constitution. In the view of the Philadelphia Bar Association, this legislative declaration of policy "highlight[s] the danger of an overreaching legislature against which the Compensation Clause was designed to protect." Philadelphia Bar Association's Brief at 9.

The Pennsylvania Bar Association adds that the very occasion for the enactment of Act 72 negates any suggestion in its declaration of policy, or in appellees' arguments, that the Act passes constitutional muster. The Pennsylvania Bar Association posits that the sole reason the General Assembly passed Act 72 was in response to the public scorn and discontent which followed upon adoption of Act 44. However, the Pennsylvania Bar Association contends, that political reason for rolling back compensation is the very type of retributive action that Section 16(a) expressly prohibits when judicial compensation is involved. The Pennsylvania Bar Association perceptively notes that, "the General Assembly [is] free to reduce [its] own compensation in response to the electorate's percep-

tion of impolitic legislative action, but [it] may not reduce judicial remuneration by reason of public criticism, or as a reaction to public dissatisfaction with their legislative action." Pennsylvania Bar Association Brief at 7. In the view of the Pennsylvania Bar Association, the General Assembly's misuse of its control over appropriations, by virtue of Act 72's repeal of Act 44, represents a direct encroachment on the integrity and independence of the Judiciary as a co-equal branch of government.

## C. Arguments in Support of Act 72's Constitutionality

All appellees maintain that Act 72's repeal of Act 44's adoption of the formula governing judicial compensation did not violate Article V, Section 16(a). In addition, appellees are in basic agreement that Section 1(b) of Act 72 merely reflects the General Assembly's express intention not to contravene Section 16(a)'s primary purpose of preserving the independence of the Judiciary; and that the definition of "salaried officers of the Commonwealth" found in Section 1(c) is proper and controlling. Each appellee, however, offers slightly divergent reasons in support of these general arguments.

Attorney General Corbett contends that the Judges have not overcome the strong presumption of constitutionality that is accorded legislative enactments. The Attorney General does not dispute that Act 72 reduced judicial compensation, but, he argues, it did so in a fashion that comported with the exception delineated in Section 16(a). Addressing the exception, the Attorney General argues that neither the Constitution, nor the cases cited by the Judges for the definition of "officer" or "public officer," specifically define "salaried officers of the Commonwealth." Therefore, the Attorney General posits, the General Assembly properly filled that void and adopted what he views as a rational and legitimate definition of that constitutional term for purposes of Act 72. The Attorney General also contends that even if other Commonwealth employees not explicitly mentioned by either Act 44 or Act 72 may be considered "salaried officers of the Commonwealth," there still is no violation of Section 16(a) because Act

72 applies generally, if only in the sense that it uniformly repeals all the salary increases that resulted from the Act 44 formulas.

Treasurer Casey's primary argument focuses on Act 44, rather than Act 72. The Treasurer argues that Act 44 was unconstitutional in its entirety at its inception; the salary increases it provided therefore were unlawful *ab initio;* and Act 72 cannot be deemed to have impermissibly reduced judicial compensation where that compensation was never "legally" increased.[21] Alternatively, Treasurer Casey argues that even if Act 44 was constitutionally enacted, Act 72 did not violate Section 16(a) because the repeal applies to all of the officers who possess the characteristics attributed to "public officers" as found in this Court's jurisprudence interpreting that term. *See, e.g., Richie, supra.* Moreover, the Treasurer maintains that Act 72 is egalitarian and applies generally as each affected officer's salary is reduced by the very same amount as it was increased by operation of the Act 44 formulas. Concerning the policy declarations, the Treasurer argues that Sections 1(b) and (c) of Act 72 do not establish the constitutionality of Act 72; rather, these Sections merely acknowledge that the General Assembly understood its constitutional limitations under Section 16(a).

In his *Herron* brief, Speaker Perzel initially and briefly indicates his agreement with Treasurer Casey that, if Act 44 were deemed to be unconstitutional, it would be void *ab initio* and, thus, Act 72 would have to be deemed to have had no unconstitutional effect upon judicial compensation. Unlike the Treasurer, however, the Speaker insists that Act 44 in fact was constitutional and, therefore, the Judges' challenge to Act 72 must be resolved. The Speaker asserts that the values that the Section 16(a) prohibition protects are: (1) preventing the retributive act of singling out judicial compensation for reduction; and (2) preserving the Judiciary as a coequal branch of government. The Speaker asserts that neither of

21. The Treasurer's argument here tracks his argument in *Stilp, infra,* that Act 44 was unconstitutional because the General Assembly's manner of passing it violated Article III of the Pennsylvania Constitution.

these two values must be deemed to have been implicated by Act 72's general repeal of all salary increases established by Act 44, because the General Assembly's policy declaration in Section 1(b) said as much. The Speaker further maintains that the General Assembly's definition of "salaried officers of the Commonwealth" in Section 1(c) is proper because, "where a position or officership is constitutionally-created but not constitutionally-defined, the General Assembly has historically defined that constitutional provision by statute." Speaker Perzel's Brief at 37. For example, the Speaker asserts, the General Assembly has previously defined the duties of the constitutional offices of State Treasurer and Auditor General. *See* PA. CONST. art. IV, § 1; *Commonwealth ex rel. Woodruff v. Lewis*, 282 Pa. 306, 127 A. 828, 829 (1925) (noting that although the offices of State Treasurer and Auditor General are named in the Pennsylvania Constitution, their duties were defined by the Legislature).

Speaker Perzel also argues that the scope of the Judges' challenge is overbroad. He contends that, even if mid-term compensation increases for the Judiciary may not be reduced under Section 16(a), Act 72 was constitutional to the extent it operated to eliminate future judicial salary increases which have not yet "vested." Thus, the Speaker maintains, if this Court were to find Act 72 unconstitutional as to judicial salaries, we may only reinstate the higher salaries initially provided by Act 44 and not those provisions in Act 44 which might lead to future increases in judicial compensation. *Cf. Will*, 449 U.S. at 229, 101 S.Ct. at 487 ("[A] salary increase 'vests' for purposes of the [Federal] Compensation Clause only when it takes effect as part of the compensation due and payable to Article III judges.").

In addition, the Speaker asserts that, even if Act 72 were deemed unconstitutional to the extent it reduced the compensation judges were receiving in November 2005, the Judiciary should be deemed entitled to that Act 44 salary only until their current terms of office expire, at which point Act 72 would lawfully take effect and operate to reduce new-term judicial compensation to pre-Act 44 levels. Thus, in the Speaker's view, any new judge who began a term of office after Novem-

ber 2005, or any sitting judge retained for a new term of office after November 2005, lawfully would be subject to the Act 72 repeal and would receive only the compensation contemplated by Act 39.

We note that this particular argument was not suggested in this Court's briefing order. But, in any event, we will summarily reject it. For one thing, Section 16(a) speaks of "terms" of office. Moreover, the Speaker's argument would require this Court to re-write Act 44 to include the distinction he would draw, even though the legislation itself does not so provide. This we decline to do. Since the legislation does not include the Speaker's distinction, we do not pass upon the Speaker's rather remarkable assertion that Section 16(a) permits the General Assembly to enact legislation that would directly reduce judicial compensation, so long as the reduction is made effective at the beginning of new elective terms of office.

Senator Jubelirer, as President *pro tempore* of the Senate, initially argues that Act 72 did not in fact reduce the compensation of any judge during his or her term of office.[22] The Senator notes that, on January 1, July 6, November 17, and December 31, 2005, the annual salaries for judges were the same, and that none of the judges challenging Act 72 assumed office between July 7, 2005 and November 16, 2005.

In the alternative, Senator Jubelirer argues that, assuming that Act 72 reduced judicial compensation, the reduction does not violate Section 16(a) for several reasons. First, the Senator maintains that the Act did not single out the Judiciary exclusively for salary diminution, but rather treated all officials whose salary was affected by the Act 44 formulas the same. Second, the Senator argues that the Judges' contention that the exception in Section 16(a) requires that the compensation of every "salaried officer of the Commonwealth" be reduced at the same time is in direct conflict with Article III, Section 27 of the Pennsylvania Constitution, which prohibits the reduction of the salary of a public officer after his election

22. Senator Jubelirer submitted a brief in *Herron* and an *amicus curiae* brief in *Brown* incorporating by reference his *Herron* brief.

or appointment.[23] The Senator maintains that, under the Judges' interpretation, the limited exception provided in Section 16(a) could never be exercised without conflicting with Article III, Section 27. Third, the Senator disputes the Judges' contention that case law provides a clear definition of "officer" or "public officer" which can be utilized to define "salaried officers of the Commonwealth." In the Senator's view, the definitions of "officer" or "public officer" in the cases relied upon by the Judges varied widely, depending upon the specific constitutional provision at issue.

Concerning the policy declarations provided in Act 72, Senator Jubelirer contends that Section 1(b) merely reflects that the intention of the General Assembly in enacting Act 72 was not to violate Section 16(a). As for the definition of "salaried officers of the Commonwealth" found in Section 1(c), the Senator maintains that such a definition was necessary because of the absence of any decision by this Court interpreting that phrase, and the previously stated need not to create a conflict with Article III, Section 27. The Senator notes that it is not uncommon for the executive or legislative branch to interpret constitutional provisions in exercising their constitutional duties, albeit he concedes that it is ultimately the responsibility of the Judiciary to determine the proper interpretation. The Senator further argues that the General Assembly's Act 72–specific definition of "salaried officers of the Commonwealth" is reasonable and provides certainty and predictability as it encompasses all members of the Legislature and Judiciary, and identifies some of the highest executive officers as the class to which any diminution of compensation must be applied in order to satisfy Section 16(a).

## D. Analysis

### - 1 -

When faced with any constitutional challenge to legislation, we proceed to our task by presuming constitution-

---

**23.** Section 27, entitled "Changes in Term of Office or Salary Prohibited," provides in its entirety: "No law shall extend the term of any public officer, or increase or diminish his salary or emoluments, after his election or appointment." Pa. Const. art. III, § 27.

ality in part because there exists a judicial presumption that our sister branches take seriously their constitutional oaths. *See* 1 Pa.C.S. § 1922(3) ("In ascertaining the intention of the General Assembly in the enactment of a statute the ... presumption [is] [t]hat the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth."); *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth,* 583 Pa. 275, 877 A.2d 383, 393 (2005) (hereinafter, *"PAGE"*). Indeed, a legislative enactment will not be deemed unconstitutional unless it clearly, palpably, and plainly violates the Constitution. *PAGE,* 877 A.2d at 393. "Any doubts are to be resolved in favor of a finding of constitutionality." *Payne v. Dept. of Corrections,* 582 Pa. 375, 871 A.2d 795, 800 (2005). Accordingly, a party challenging the constitutionality of a statute bears a very heavy burden of persuasion. *See Commonwealth v. Barud,* 545 Pa. 297, 681 A.2d 162, 165 (1996). In cases where this Court is asked to construe provisions of the Pennsylvania Constitution, "the fundamental rule of construction which guides [the Court] is that the Constitution's language controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *Ieropoli v. AC&S Corp.,* 577 Pa. 138, 842 A.2d 919, 925 (2004). Our ultimate touchstone is the actual language of the Constitution itself. *See Firing,* 353 A.2d at 835–36.

For purposes of deciding the Judges' challenge to Act 72, we will assume that Act 44 was constitutionally enacted; we will then separately consider the challenges to Act 44, and the consequences those challenges would have for the Judges' appeals, in our discussion of *Stilp, infra.* Assuming, then, that the compensation provisions in Act 44 were constitutional, the controlling questions are: (1) whether Act 72 acted to diminish judicial compensation; and (2), if it did, whether the reduction was constitutional in light of Article V, Section 16(a). For the reasons that follow, we hold that Act 72 did diminish judicial compensation; and that the circumstances do not implicate the exception to the constitutional prohibition on

such action. Act 72 is clearly, palpably, and plainly unconstitutional to the extent that it diminishes judicial compensation.

- 2 -

 The question of whether Act 72 operates to diminish judicial compensation need not detain us long. Act 44 adopted a formula that operated to directly increase judicial salaries beginning on July 7, 2005. Approximately four months later, with the enactment of Act 72 on November 16, 2005, the General Assembly reduced those salaries during the judges' terms of office. Since that date, judicial salaries have been restored to their pre-Act 44 levels, *i.e.*, to the level set forth in Act 39. Indeed, most appellees do not dispute that Act 72 reduced judicial compensation. Only Senator Jubelirer suggests that Act 72 did not diminish the compensation of any judge during his or her term of office, by arguing that on January 1, July 6, November 17, and December 31, 2005, the annual salaries for judges were the same, and that none of the Judges challenging Act 72 assumed office between July 7 and November 16, 2005. This argument does violence to the plain meaning of the word "during" in Section 16(a). The increased compensation paid to the Judiciary from July through November 2005 occurred during their terms of office, and that compensation was reduced during their terms of office. Moreover, if the Senator's argument were plausible, Act 72's "policy" declarations, which refer specifically to Article V, Section 16(a), are inexplicable. Thus, we hold that Act 72 reduced judicial compensation during judges' terms of office.

- 3 -

 a. Turning to the more vigorously contested question of whether the exception to Section 16(a) is applicable, we begin with the history and experience of the constitutional protection for judicial compensation. This provision was not new to the 1968 version of the Pennsylvania Constitution. Indeed, similar provisions prohibiting the reduction of judicial compensation were also included in the Pennsylvania Constitutions of 1776, 1790, 1834, and 1870. What was new to the 1968

Constitution was the limited exception to this express prohibition. That exception was proposed by the Pennsylvania Bar Association during the 1967–1968 Constitutional Convention, which suggested allowing for the prospect of reducing judges' salaries, along with the salaries of "all salaried officers of the Commonwealth," if dire financial circumstances arose. *See* Preparatory Committee's Reference Manual No. 5, *The Judiciary* at 67.

Article V, Section 16(a)'s prohibition against the reduction of judges' compensation during their terms of office is modeled after Article III, Section 1 of the Federal Constitution, familiarly known as the Compensation Clause, which provides:

The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behavior, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

U.S. CONST. art. III, § 1. In reviewing the Compensation Clause, the United States Supreme Court has noted that it is rooted in the historic Anglo–American tradition of an independent Judiciary. *See Will,* 449 U.S. at 217, 101 S.Ct. at 482. "A Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government." *Id.* at 217–18, 101 S.Ct. at 482. Alexander Hamilton wrote in The Federalist No. 79 of the primacy of maintaining judicial independence and protecting judicial compensation to achieve that salutary end:

Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support.... In the general course of human nature, *a power over a man's subsistence amounts to a power over his will.* And we can never hope to see realized in practice the complete separation of the judicial from the legislative power, in any system which leaves the former dependent for pecuniary resource on the occasional grants of the latter.

THE FEDERALIST No. 79, at 472 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

Article V, Section 16(a)'s protection of judicial compensation is but a part of a more global protection of the fundamental, coequal role of the Judiciary, as provided by the doctrine of separation of powers. The government of the Commonwealth of Pennsylvania, like the federal government, is divided into three equal branches, the legislative, *see* PA. CONST. art. II, § 1 ("The legislative power of this Commonwealth shall be vested in a General Assembly ...."); the executive, *see* PA. CONST. art. IV, § 2 ("The supreme executive power shall be vested in the Governor ...."); and the judicial, *see* PA. CONST. art. V, § 1 ("The judicial power of the Commonwealth shall be vested in a unified judicial system...."). As noted by the United States Supreme Court:

> [The doctrine of separation of powers] is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital ... namely, to preclude a commingling of these essentially different powers of government in the same hands.

*O'Donoghue v. United States,* 289 U.S. 516, 530, 53 S.Ct. 740, 743, 77 L.Ed. 1356 (1933).

Recently, the Supreme Court of Illinois addressed the vulnerability of the Judiciary, and the concomitant importance of the doctrine of separation of powers. *See Jorgensen v. Blagojevich,* 211 Ill.2d 286, 285 Ill.Dec. 165, 811 N.E.2d 652 (2004). The dispute in *Jorgensen* centered on the suspension of the Illinois Judiciary's cost-of-living adjustments ("COLAs") for the 2003 and 2004 fiscal years by the Illinois General Assembly and the Governor. Under Illinois law, judicial salaries, along with the salaries for other government officials, were determined by a Compensation Review Board ("Board"), which in turn was created by a Compensation Review Act. The Board was required to undertake periodic reevaluations of officials' salaries, adjust them based on a variety of factors, and then submit a report to the Illinois General Assembly. After the Board filed its report, the General Assembly was

permitted to disapprove of it in whole or reduce it proportionately.

In 1990, the Board issued a report setting specific salaries for each of the offices and positions covered under the Compensation Review Act, and also determined that the salaries were to include automatic annual COLAs. These COLAs were deemed a component of salary fully vested if and when the Board's report became law. The 1990 report was submitted to the General Assembly pursuant to the Compensation Review Act. The General Assembly then adopted a resolution that proportionally reduced the amount of compensation set by the Board for the various offices, but it expressly approved the portions of the Board's report establishing automatic annual COLAs for the affected offices, including the Illinois Judiciary.

Thereafter, however, in 2002, the Illinois General Assembly suspended the COLAs for the state's 2003 fiscal year. In light of this legislative action, the Illinois Judiciary was not paid the COLA component of their salaries for the 2003 fiscal year. For the 2004 fiscal year, however, the General Assembly targeted funds, in an appropriation bill which was passed in the spring of 2003, to implement the COLAs for the Judiciary. The portion of the bill appropriating funds for the judicial COLAs, however, was removed via a reduction veto signed by the Governor of Illinois.

Two Illinois trial court judges then filed a class action lawsuit on behalf of all Illinois judges. The complaint sought a declaration that the Governor's veto of the 2004 fiscal year COLA was unconstitutional, and that the act passed by the General Assembly suspending the 2003 fiscal year COLA violated a provision of the Illinois Constitution which, like its Pennsylvania and Federal counterparts, prohibited the reduction of judges' salaries during their terms of office. The Illinois Supreme Court held that the actions by the coordinate branches of government violated the Illinois Constitution. In so holding, the court determined that the COLAs for the 2003 and 2004 fiscal years had been fully vested as a component of

judicial salaries since the 1990 report issued by the Compensation Review Board.

In undertaking its analysis, the *Jorgensen* court addressed the importance of the separation of powers in detail. The court's analysis is cogent, and is relevant to the matters at issue, so it bears acknowledgement at length:

> Avoiding the concentration of governmental powers in the same person or political body was seen by the founding fathers as essential to freedom and liberty. Preventing the excessive concentration of authority by one branch is why the system of mutual checks and balances by and among the three branches of government was incorporated into the structure of our government. 3 C. Antieau, Modern Constitutional Law 376–77 (2d ed. 1997). For checks and balances to work properly in protecting individual liberty, each of the three branches of government must be kept free from the control or coercive influence of the other branches. Insuring the independence of the respective branches of government is the real thrust of the separation of powers doctrine.

> While the three branches of government enjoy equal status under the constitution, their ability to withstand incursions from their coordinate branches differs significantly. The judicial branch is the most vulnerable. It has no treasury. It possesses no power to impose or collect taxes. It commands no militia. To sustain itself financially and to implement its decisions, it is dependent on the legislative and executive branches.

> This presents a profound problem. As arbiters of the law and guardians of individual liberties, members of the judiciary often find themselves at odds with these other branches of government. In fulfilling their duties, judges must frequently challenge the actions of the very governmental bodies who provide the financial and other resources they need to operate. Such challenges are unavoidable. They are an inherent part of the adjudicatory process. That their constitutional duty requires this of judges does not mean their decisions will be well received by the other branches of

government. Retribution against the courts for unpopular decisions is an ongoing threat.

The vulnerability of the judicial branch is exacerbated because, unlike the executive and legislative branches, the judiciary has no true electoral constituency. Although judges in Illinois are elected, they do not represent the voters in the same way executive officers or legislators do. Citizens in a community typically refer to "their alderman," "their representative," "their senator," or "their mayor," but no member of the public can rightly claim a particular member of the judiciary as "their judge." Lacking an electoral constituency, judges command no popular allegiance. That, in turn, renders them easy targets for those who would condemn unpopular judicial rulings.

In the Federalist, No. 78, Alexander Hamilton touched on some of these issues. He wrote:

"The executive not only dispenses the honors, but holds the sword of the community. The Legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither force nor will, but merely judgment. This simple view of the matter suggests several important consequences. It proves incontestably that the judiciary is beyond comparison the weakest of the three departments of power; that it can never attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks."

*Id.* at 660–61 (citation omitted).

In rendering its decision, the *Jorgensen* court noted its sensitivity to the fact that "substantial budgetary challenges currently confront the Governor and the General Assembly," and that, despite their best efforts, budget shortfalls persisted. *Id.* at 669. The court stressed that it did "not mean to diminish the seriousness of the situation or appear insensitive

to the difficulties faced by our coordinate branches of government." *Id.* Those factors, however, could not deter the court from enforcing a plain constitutional restriction which was so vital to the separation of powers:

> Those difficulties are undeniable, and we are highly cognizant of the need for austerity and restraint in our spending. As administrators of the judiciary, we make every effort to economize whenever and however we can. One thing we cannot do, however, is ignore the Constitution of Illinois.

> This court did not set the salaries judges receive, nor did we make COLAs a component of those salaries. The salaries, including their COLA component, were provided by law in the manner described earlier in this opinion. Now that those salaries have been implemented, the constitution commands that they be paid. No principle of law permits us to suspend constitutional requirements for economic reasons, no matter how compelling those reasons may seem.

*Id.* at 669–670. Accordingly, the *Jorgensen* court ordered the Illinois Comptroller, upon receipt of vouchers prepared by the Administrative Office of the Illinois Courts, to issue warrants drawn on the state treasury to pay the Illinois Judiciary the COLAs which had vested for the 2003 and 2004 fiscal years.

As the *Jorgensen* court recognized, the vulnerability of the judicial branch cannot be allowed to impair its duty and power to decide cases and effectuate its judgment. Thus, for example, this Court has previously addressed the primacy of the Judiciary's power to compel the executive and legislative branches to furnish resources essential to the operation of the courts.

> It is a basic precept of our Constitutional form of Republican Government that the Judiciary is an independent and co-equal Branch of Government, along with the Executive and the Legislative Branches....

> Because of the basic functions and inherent powers of the three co-equal Branches of Government, the co-equal independent Judiciary must possess rights and powers co-equal

with its functions and duties, including the right and power to protect itself against any impairment thereof. . . .

Expressed in other words, the Judiciary *must possess* the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities, and its powers and duties to administer Justice, if it is to be in reality a co-equal, independent Branch of our Government. This principle has long been recognized, not only in this Commonwealth but also throughout our Nation. . . .

The very genius of our tripartite Government is based upon the proper exercise of their respective powers together with harmonious cooperation between the three independent Branches. However, if this cooperation breaks down, the Judiciary must exercise its inherent power to preserve the efficient and expeditious administration of Justice and protect it from being impaired or destroyed. . . .

*Commonwealth ex rel. Carroll v. Tate,* 442 Pa. 45, 274 A.2d 193, 196–97 (1971) (citations and footnote omitted).

We do not reproduce these settled precepts as mere platitudes. Our exploration of the fundamental reasons underlying the constitutional protection against diminishing judicial compensation is essential to understanding why it is that the legislative reasoning for reducing judicial compensation is generally irrelevant to the constitutional inquiry, unless the Section 16(a) exception applies. The deference that this Court typically applies to legislative enactments is diminished when the issue involves judicial branch compensation, because of the very same constitutional edict.

Thus, even if the effect of the reduction in judicial compensation resulting from Act 72 appeared to be warranted in the good faith judgment of the Legislature, the legislative motivation is not of primary importance. Rather, "[w]hat is at stake is the very independence of the judiciary and the preservation of separation of powers." *Jorgensen,* 285 Ill.Dec. 165, 811 N.E.2d at 668. If the General Assembly possessed the authority to reduce judicial compensation in response to a politi-

cal backlash against the content or manner of adoption of a legislative provision, and in violation of Article V, Section 16(a), there would be no barrier preventing it from pursuing other means of attacking the independence of the Judiciary, and the concern expressed by this Court in *Tate* concerning the destruction of the independent Judiciary could very well come to fruition.

This Court has previously discussed Article V, Section 16(a), but not in terms of the specific issues posed in the matters *sub judice*. In *Firing*, 466 Pa. 560, 353 A.2d 833, this Court addressed the issue of whether the State Court Administrator and State Treasurer wrongfully diminished the salary of a justice of the peace (now magisterial district judge) during his term of office in violation of Section 16(a). The justice of the peace was mandatorily retired upon his seventieth birthday, pursuant to Article V, Section 16(b), with three years remaining on his six-year term of office. The justice of the peace filed a petition for review in the nature of mandamus in the Commonwealth Court alleging that the reduction of his salary resulting from his retirement violated Section 16(a). On appeal, this Court held that the term of the justice of the peace expired upon his retirement at age seventy, and thus, he was not entitled to his salary, in retirement, for the balance of his elected term. In support of this holding, we noted the following concerning Section 16(a):

> [T]he well-established purpose of the prohibition against diminishing the compensation of the judiciary during their terms of office, contained in Section 16(a) . . . is to maintain the independence of the judiciary from encroachment by the other branches of government.

*Id.* at 837.

This Court next addressed Section 16(a) in *Flack v. Barbieri*, 488 Pa. 46, 410 A.2d 1216 (1980). In *Flack*, we rejected a Section 16(a) challenge from a district justice of the peace who alleged that his compensation was unconstitutionally diminished by the correction of a clerical error concerning new salaries based on a recertification of the population of all magisterial districts using the 1970 United States census. This Court

determined that no diminution of salary occurred because an administrative oversight or clerical error resulted in the justice of the peace receiving a salary higher than that to which he was entitled. We then added that the purpose of Section 16(a) is to preserve the Judiciary's independence, and that this purpose was not impeded in this case. *See id.* at 1219.

. Numerous other decisions by this Court have addressed Section 16(a) in the context of judges' pension benefits, and have held that pension benefits are part of the adequate compensation mandated by Section 16(a), which the General Assembly may not arbitrarily reduce. *See, e.g., Klein v. Commonwealth, State Employees' Ret. System,* 521 Pa. 330, 555 A.2d 1216 (1989) (plurality opinion); *Goodheart v. Casey,* 521 Pa. 316, 555 A.2d 1210 (1989) (plurality opinion); *Catania,* 498 Pa. 684, 450 A.2d 1342; *McKenna v. State Employees' Ret. Bd.,* 495 Pa. 324, 433 A.2d 871 (1981) (plurality opinion); *Wright v. Retirement Bd. of Allegheny County,* 390 Pa. 75, 134 A.2d 231 (1957).

**b.** Given that our cases have recognized the purpose of the protective provision, it is foreseeable that Act 72 would be defended by appellees on grounds of its supposedly benign purpose. But, merely because the General Assembly salutarily claimed it did not intend to interfere with the independence of the Judiciary, that does not mean that the legislation must be deemed constitutional. As correctly noted by the Judges, the constitutional test set forth in Section 16(a) is not whether the General Assembly intended to interfere with the independence of the Judiciary, but rather the simpler, straightforward question of whether judicial compensation was diminished by a law that does not apply generally to "all salaried officers of the Commonwealth." Because the policy declaration announced by the General Assembly in Section 1(b) of Act 72 is not probative of the question posed by the plain language of Section 16(a), it cannot control our inquiry. Indeed, for this Court to accept the notion that legislative pronouncements of benign intent can control a constitutional inquiry concerning diminishing judicial compensation would be tantamount to

ceding our constitutional duty, and our independence, to the legislative branch.

■ **c.** The primary argument forwarded by the Judges as to why Act 72 does not fit within the single exception provided in Section 16(a) is that the Act did not diminish the compensation of **all** "salaried officers of the Commonwealth." We agree. As previously noted, there is no case law interpreting or defining this phrase. However, similar terms, such as "officer" and "public officer," which are found in other constitutional provisions have been addressed in numerous appellate court decisions in this Commonwealth. *See Werner,* 681 A.2d at 1337 (determining that Special Investigator III in Inspector General's Office was not an "officer" under Article VI, Section 7 of Pennsylvania Constitution, and explaining that "[a] person will be deemed a public officer if the person is appointed or elected to perform duties of a grave and important character, and which involve some of the functions of government, for a definite term."); *Vega,* 147 A.2d at 623 (concluding that police chief was not a "public officer" but merely a "public employee" under a statute outlining the procedure for the removal of borough police officers, and noting that "the test to be applied in determining a public officer is ... [whether] the officer is chosen by the electorate, or appointed, for a definite and certain tenure in the manner provided by law to an office whose duties are of a grave and important character, involving some of the functions of government, and are to be exercised for the benefit of the public for a fixed compensation paid out of the public treasury . . . .") (quoting *Alworth,* 85 Pa.Super. at 352); *Commonwealth ex rel. Foreman v. Hampson,* 393 Pa. 467, 143 A.2d 369, 372–73 (1958) (determining that county solicitor was not a "county officer" under Article XIV, Section 1 of the Pennsylvania Constitution pursuant to the tests announced in *Alworth* and *Richie*); *Commonwealth ex rel. Goshorn v. Moore,* 266 Pa. 100, 109 A. 611, 612 (1920) *(per curiam;* adopting opinion of Superior Court) (finding that registration commissioners were "public officers" within the meaning of Article III, Section 13 of the Pennsylvania Constitution, and citing *Richie* for the

following factors for determining a "public officer": "the duties of the officer are to be exercised for the benefit of the public for a stipulated compensation paid by the public"; "the term is definite and the tenure certain"; and "the powers, duties, and emoluments become vested in a successor when the office becomes vacant."); *Commonwealth ex rel. Wolfe v. Moffitt,* 238 Pa. 255, 86 A. 75 (1913) (concluding that directors of the poor for Washington County were "public officers" under Article III, Section 13 of the Pennsylvania Constitution, and noting that "wherever an officer exercises important duties and has delegated to him some of the functions of government, and his office is for a fixed term, and the power, duties, and emoluments become vested in a successor when the office becomes vacant, such official may properly be called a public officer."); *Richie,* 74 A. at 431 (determining that term "public officer" in Article III, Section 13 of the Pennsylvania Constitution encompassed appointed real estate assessor; factors to be examined are "the nature of the service to be performed by the incumbent," the "duties imposed upon him," whether "those duties are of a grave and important character, involving in the proper performance of some of the functions of government," and "a fixed term."); *Houseman v. Commonwealth ex rel. Tener,* 100 Pa. 222 (1882) (finding that a receiver of delinquent taxes was a "public officer" under Article VI, Section 4 of the Pennsylvania Constitution); *Alworth,* 85 Pa.Super. at 352 (determining the legal counsel for the Board of Registration Commissioners for the City of Scranton was not a "public officer" within the meaning of Article III, Section 13 of the Pennsylvania Constitution, and stating the following test: "If the officer is chosen by the electorate, or appointed, for a definite and certain tenure in the manner provided by law to an office whose duties are of a grave and important character, involving some of the functions of government, and are to be exercised for the benefit of the public for a fixed compensation paid out of the public treasury, it is safe to say that the incumbent is a public officer . . . .").

▇▇▇▇ For purposes of decision here, it is not necessary to pronounce a precise or comprehensive definition for the term

"salaried officers of the Commonwealth" as provided in Section 16(a). What can be distilled from the cases above is that certain factors are important in determining whether a person can be said to be an "officer" or "public officer," including: (1) whether the person is appointed or elected to the position; (2) whether the person performs duties of a grave and important character; (3) whether the duties performed involve some of the functions of government; (4) whether the duties performed are for the benefit of the public; (5) whether the person receives a fixed salary paid out of the public treasury; (6) whether the person's term is definite or fixed; and (7) whether the powers, duties, and emoluments become vested in a successor when the office becomes vacant. An evaluation of the above listed factors, as applied to the numerous officers cited by the Judges, leads to the unavoidable conclusion that Act 72 did not diminish the pay of "all salaried officers of the Commonwealth." For example, the executive officers (including cabinet members) named by the Judges are obviously salaried public officers. Therefore, Act 72's reduction of judicial compensation does not fit within the single exception provided in Article V, Section 16(a); thus, Act 72 is unconstitutional to the extent it decreased judicial compensation.[24]

Act 72 does not qualify for the Section 16(a) "all salaried officers" exception for a second, independent reason. As noted by the Judges, Act 72 did not diminish the current salaries of the executive officers whose salary structure was specifically addressed in Act 44. As previously noted, the elected executive officers specifically identified and affected by Act 44 include the Governor, the Lieutenant Governor, the State Treasurer, the Auditor General, and the Attorney General. Act 44, § 3 (amending 71 Pa.C.S. §§ 1102–03). The appointed Cabinet members specifically identified and affected by Act 44 were the Adjutant General, the Secretary of Aging,

---

24. With respect to Senator Jubelirer's argument that the narrower definition adopted by the General Assembly was necessary because, otherwise, the exception to the prohibition on the diminishment of judicial compensation in Section 16(a) would conflict with Article III, Section 27, we note that the Senator does not cite any authority in support of his position. In any event, the conflict the Senator perceives is an insufficient ground to ignore the command of Section 16(a).

the Secretary of Agriculture, the Secretary of Banking, the Secretary of the Commonwealth, the Secretary of Community and Economic Development, the Secretary of Conservation and Natural Resources, the Secretary of Correction, the Secretary of Education, the Secretary of Environmental Protection, the Secretary of General Services, the Secretary of Health, the Insurance Commissioner of the Commonwealth, the Secretary of Labor and Industry, the Secretary of Public Welfare, the Secretary of Revenue, the Pennsylvania State Police Commissioner, and the Secretary of Transportation. *Id.* (amending 71 Pa.C.S. § 1102(c)).

The salary increases provided for the named elected executive officers, pursuant to Act 44's formulas, were applicable only to individuals elected to these offices after the July 7, 2005 effective date of the Act, *see* Act 44, § 4(4); correspondingly, the salary increases applicable to the named Cabinet officers, under the Act 44 formulas, were not available to individuals appointed to these offices until after December 31, 2006, *see* Act 44, § 4(3). Thus, the formula-based salary increases provided to these named executive officers, unlike the increases in compensation provided to the Judiciary and the Legislature (through the guise of unvouchered expenses), never became effective because Act 72 repealed Act 44 before any of these executive officers were either elected or appointed. Therefore, because none of the named executive officers, and in fact no executive officers at all, had their salaries increased by Act 44, none had their salaries decreased by Act 72. Accordingly, Section 16(a)'s exception does not apply, and Act 72's reduction of judicial compensation cannot withstand constitutional scrutiny for this independent reason.[25]

25. In addition, under the definition provided in Section 1(c) of Act 72, the General Assembly pronounced that the executive officers specifically named in Act 44 are "salaried officers of the Commonwealth." The officers named in Act 44 include the Governor, the Lieutenant Governor, the State Treasurer, the Auditor General, the Attorney General, the Adjutant General, the Secretary of Aging, the Secretary of Agriculture, the Secretary of Banking, the Secretary of Community and Economic Development, the Secretary of the Commonwealth, the Secretary of Education, the Secretary of Environmental Protection, the Secretary of General Services, the Secretary of Health, the Insurance Commissioner,

We find further support for our conclusion by considering the purpose of the limited exception provided in Section 16(a). As previously noted, the exception was intended as a failsafe during a state-wide economic crisis, thus aiding the Commonwealth in maintaining solvency during such a crisis. As noted by the Judges, the period between July and November 2005 was not marred by economic disruption. In fact, Act 72 was passed in an effort to assuage lingering public outrage over certain provisions of Act 44, which seemed to be expressed when the electorate narrowly rejected former Justice Nigro's bid for retention.

Turning to the second issue, concerning the impact of the General Assembly's policy declarations in Sections 1(b) and (c) of Act 72, we agree with the Judges that those declarations cannot alter the constitutional analysis we have engaged in above. As we have previously noted, the General Assembly's declaration in Section 1(b) is contrary to the plain language of Article V, Section 16(a). The test set forth in the constitutional provision is not whether the General Assembly intended to interfere with the independence of the Judiciary, but rather is whether judicial compensation was reduced by a law that does not apply generally to "all salaried officers of the Commonwealth." The stated intention of the General Assembly does not and cannot supplant the mandate of the constitutional provision.

Turning to Section 1(c)'s definition of "salaried officers of the Commonwealth," Senator Jubelirer is correct that it is not uncommon for the Legislature or Executive to interpret constitutional provisions during the exercise of their respective constitutional duties. However, as the Senator

the Secretary of Labor and Industry, the Secretary of Public Welfare, the Secretary of Revenue, the State Police Commissioner, the Secretary of Transportation, the Secretary of Corrections, the Secretary of Conservation and Natural Resources, and the Commissioners of the Pennsylvania Public Utility Commission. Act 72, § 5 (reenacting and amending Act 39, § 3(a), (b)). Similar to the officers named in Act 44, none of these named officers had their salaries reduced by Act 72. Thus, even under the definition of "salaried officers of the Commonwealth" provided by the General Assembly, Act 72 fails to satisfy the exception provided in Article V, Section 16(a).

recognizes, the ultimate power and authority to interpret the Pennsylvania Constitution rests with the Judiciary, and in particular with this Court. *See* PA. CONST. art. V, § 2.[26] As we have already noted, the legislative definition is contrary to the plain meaning of Section 16(a), as well as substantial case law examining the definition of a public officer. Moreover, we recognize that the General Assembly obviously crafted its definition of the constitutional term in the hope of controlling this Court's construction of Article V, Section 16(a)'s limited exception. The inclusion of the definition reflects the General Assembly's palpable awareness that Act 72 was constitutionally suspect, to the extent that it decreased judicial compensation. Therefore, we respectfully decline to accept as controlling Section 1(c)'s definition of "salaried officers of the Commonwealth" for purposes of Article V, Section 16(a).

The issue that remains is whether the unconstitutional aspects of Act 72 may be severed from the remaining provisions of the Act. First, we note that Act 72, unlike Act 44, does not contain a nonseverability provision. Second, the parties do not argue that, if this Court were to find Act 72 unconstitutional as applied to the reduction in judicial compensation, the relevant provisions would not be severable. Accordingly, our decision is guided by the presumption of severability provided in Section 1925 of the Statutory Construction Act, 1 Pa.C.S. § 1501 *et seq.*:

The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend

---

**26.** As stated by Alexander Hamilton in The Federalist No. 78:

The interpretation of the laws is the proper and peculiar province of the courts. A constitution is in fact, and must be, regarded by the judges as a fundamental law. It therefore belongs to them to ascertain its meaning as well as the meaning of any particular act proceeding from the legislative body.

THE FEDERALIST No. 78.

upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

1 Pa.C.S. § 1925. The two exceptions to the presumption of severability noted in Section 1925 are not applicable here because: Act 72's provisions repealing the increase in judicial compensation are not essentially and inseparably connected with the other provisions of Act 72; and, the remaining valid provisions are unquestionably capable of being executed in accordance with the legislative intent. *See PAGE*, 877 A.2d at 403; *Commonwealth v. Mockaitis*, 575 Pa. 5, 834 A.2d 488, 502–03 (2003).

In sum, we hold that Act 72 is clearly, palpably, and plainly unconstitutional to the extent that it diminished judicial compensation; Act 72 directly diminished judicial compensation, and it did so in a fashion which does not implicate the narrow exception provided in Article V, Section 16(a). However, under Section 1925 of the Statutory Construction Act, our finding of this unconstitutional effect does not taint the remainder of Act 72. Thus, we find that the remainder of Act 72's repeal of Act 44 is valid.

### III. CONSTITUTIONALITY OF ACT 44: THE STILP APPEAL

#### A. Introduction

Act 44, entitled "A[n] A[ct] [a]mending Titles 42 (Judiciary and Judicial Procedure), 46 (Legislature) and 71 (State Government) of the Pennsylvania Consolidated Statutes, providing for compensation; and making an inconsistent repeal," established a comprehensive plan which adopted formulas tying compensation and future increases in compensation for the Pennsylvania Judiciary, the General Assembly, and top executive officials to the salaries of federal judges, members of Congress, and top federal executive officials. For example, Act 44 provided that the salaries paid to Justices of this Court

would be the same as the base salaries paid to circuit judges of the Courts of Appeals, *see* Act 44, § 1 (amending 42 Pa.C.S. § 1802(a)); salaries paid to members of the General Assembly were to be equal to 50% of the base salary paid to members of the United States House of Representatives, *see* Act 44, § 2 (amending 46 Pa.C.S. § 1102); and the salary paid to the Governor was to be equal to 85% of the base salary paid to the Vice President of the United States, *see* Act 44, § 3 (amending 71 Pa.C.S. § 1102(a)).

In addition to the provisions adopting new compensation formulas, Act 44 contained several constitutionally problematic provisions. One such provision was the unvouchered expense provision, which applied exclusively to the Legislature. As previously noted, this provision permitted current legislators to receive the dollar-for-dollar equivalent of their future salary increase immediately through the mechanism of unvouchered expenses, with the payments ending upon each individual legislator's next election. *See* Act 44, § 2 (amending 46 Pa.C.S. § 1107). Another problematic provision was a nonseverability clause, apparently adopted in anticipation of litigation, which provided that if any provision of the Act were deemed unconstitutional, the entire Act would be void. *See* Act 44, § 6.

Stilp raised several constitutional challenges to Act 44. In light of these challenges, we directed the parties to address the following five issues:

(1) Whether Stilp has standing to bring an action challenging the constitutionality of Act 44?

(2) Whether the General Assembly's adoption of Act 44 violated:

a) Article III, Section 1 of the Pennsylvania Constitution;

b) Article III, Section 2 of the Pennsylvania Constitution;

c) Article III, Section 3 of the Pennsylvania Constitution; and/or

d) Article III, Section 4 of the Pennsylvania Constitution?

(3) Whether the system of unvouchered expenses established by Act 44 violated the Pennsylvania Constitution, and

whether this Court should reconsider and/or overrule the decision in *Consumer Party of Pennsylvania v. Commonwealth*, 510 Pa. 158, 507 A.2d 323 (1986)?

(4) In the event any portion of Act 44 is deemed unconstitutional, whether enforcement of the nonseverability provision in the statute would violate Article V, Section 16(a) of the Pennsylvania Constitution?

(5) Whether Stilp's constitutional challenges are moot?

*Stilp*, 889 A.2d 499.

Again, because this Court assumed plenary jurisdiction over this matter, there is no lower court decision or order under review. The questions involved are purely legal; thus, our scope of review is plenary and our standard of review is *de novo*. We will address the first and fifth questions first because a finding either of no standing or of mootness would obviate the necessity for addressing the constitutional challenges. *See Ballou v. State Ethics Commission*, 496 Pa. 127, 436 A.2d 186, 187 (1981) ("[W]hen a case raises both constitutional and non-constitutional issues, a court should not reach the constitutional issue if the case can properly be decided on non-constitutional grounds.").

## B. Standing

As a preliminary matter, and for purposes of this appeal, we accept that Stilp has standing to challenge the constitutionality of Act 44. Specifically, we find that Stilp has satisfied the requirements necessary for taxpayer standing consistent with the recognition of this exception to traditional standing requirements announced in *Application of Biester*, 487 Pa. 438, 409 A.2d 848 (1979). Under *Biester*, a taxpayer has standing to challenge an act if: (1) the governmental action would otherwise go unchallenged; (2) those directly and immediately affected by the complained-of matter are beneficially affected and not inclined to challenge the action; (3) judicial relief is appropriate; (4) redress through other channels is unavailable; and (5) no other persons are better situated to assert the claim. *Pittsburgh Palisades Park, LLC v. Commonwealth*, 585 Pa. 196, 888 A.2d 655, 662 (2005) (citing

*Consumer Party,* 507 A.2d at 329). If not for Stilp's challenge, Act 44 would go unchallenged because the very individuals who enacted the legislation—*i.e.,* the members of the General Assembly—were directly and beneficially affected by the legislation and thus would not be inclined to challenge its constitutionality. Therefore, the first two requirements are satisfied. Judicial relief is appropriate because it is the court's role to determine the constitutionality of a piece of legislation. Furthermore, redress through other channels is unavailable since there are no agencies or tribunals with jurisdiction to grant the redress sought by Stilp. Lastly, there are no other persons better situated to assert the claim because all those directly and immediately affected by Act 44 are beneficially affected by the Act and have not brought, and are not likely to bring, a cause of action in state court.[27] This is especially so because Act 72 has now repealed Act 44. Accordingly, Stilp has taxpayer standing to maintain this action.

## C. Mootness

■ Additionally, we find that, notwithstanding Act 72's repeal of Act 44, Stilp's constitutional challenges are not moot. *See Commonwealth, Dep't of Envtl. Res. v. Jubelirer,* 531 Pa. 472, 614 A.2d 204, 211–12 (1992) (where challenged statute is later repealed, judicial consideration of its constitutionality is moot). Because of our above determination that the provisions of Act 72 repealing the Act 44 formula which resulted in compensation increases for the Judiciary are unconstitutional, part of Act 44, at least presumptively, is still operative. Stilp's challenges regarding Article III procedural flaws therefore are not moot. Moreover, Stilp's constitutional challenge to Act 44's unvouchered expense provision and his related challenge to this Court's precedent in *Consumer Party* are

27. We note that Representative Greg Vitali was a plaintiff in a federal court action which challenged the constitutionality of Act 44. *See Common Cause of Pennsylvania v. Commonwealth,* Civ. Action No. 1:05–CV–2036, 447 F.Supp.2d 415, 2006 WL 1620231 (M.D. Pa. June 12, 2006). No legislator, however, joined Stilp in the present action, nor did any file a state court challenge.

reviewable because Act 44's nonseverability provision purports to require declaring all of Act 44 void if any individual provision were deemed unconstitutional.

### D. Article III Procedural Challenges

 Stilp maintains that the General Assembly violated the procedural protections provided in Article III, Sections 1–4 of the Pennsylvania Constitution. Our recent decision in *PAGE, supra*, is controlling on this subject. In *PAGE*, a group of petitioners challenged the procedure by which the Pennsylvania Race Horse Development and Gaming Act ("Gaming Act") was enacted, arguing that the General Assembly violated Article III, Sections 1, 3, 4, 6, and 10. Prior to this Court's analysis of each discrete constitutional challenge, we discussed the reasoning behind the adoption of Article III:

> Article III can be viewed as a constellation of constitutional requirements that govern various aspects of the legislative enactment procedure. Each of these provisions was born in a time in which Pennsylvanians were experiencing rapid growth economically and " 'wrenching' social change...." An enormous growth in the corporate form of business organization led to significant concentrations of wealth and the corruption of numerous legislators. Corruption took the form of special laws legislation, logrolling, and arbitrary favoritism and was met with a demand for reform. The Constitutional Convention of 1872–73 was convened to reform corrupt legislative behavior, and to this end, the result was the constitutional strictures contained in Article III. Thus, while these changes to the Constitution originated during a unique time of fear of tyrannical corporate power and legislative corruption, these mandates retain their value even today by placing certain constitutional limitations on the legislative process.

*PAGE*, 877 A.2d at 394 (citations and footnote omitted). Generally, Article III's purpose is "to place restraints on the legislative process and encourage an open, deliberative and accountable government." *City of Philadelphia*, 838 A.2d at

585 (quoting *Pennsylvania AFL–CIO ex rel. George v. Commonwealth*, 563 Pa. 108, 757 A.2d 917, 923 (2000)).

Following preliminary determinations regarding jurisdiction and standing, the *PAGE* court comprehensively surveyed and summarized guiding principles in the area of Article III, ultimately holding that the majority of the Gaming Act passed constitutional muster; however, we did strike certain portions of the Gaming Act as violative of Article III, Section 3 and pursuant to the Act's severability provision.[28] *PAGE*, 877 A.2d at 419. Specifically, with regard to the single subject requirement of Article III, Section 3, we found that the single unifying subject of the Gaming Act was the regulation of gaming, and that a majority of the Act's provisions, except for certain disbursement provisions, were germane to this single subject. *Id.* at 404. We also determined that the title of the Gaming Act put a reasonable person on notice of the general subject matter of the Act, therefore satisfying the clear expression of title requirement provided in Article III, Section 3. *Id.* at 406. Concerning the Article III, Section 1 challenge, we concluded that the process by which the Gaming Act was enacted did not violate the constitutional provision's prohibition on alteration or amendment so as to change the original purpose of the Act. *Id.* at 409–10. Finally, with regard to the challenge raised under Article III, Section 4, we concluded that because the petitioners had failed to establish a violation under Article III, Section 1 or 3, and because the record demonstrated that the bill which ultimately became the Gaming Act was read on three separate occasions in each House, the petitioners failed to prove a Section 4 violation. *Id.* at 410.

When a challenge is forwarded concerning the process by which legislation is enacted, rather than the substance of the legislation, concerns of comity and separation of

28. The Gaming Act contained a severability clause stating that provisions of the Act were to be deemed severable except for two limited exceptions concerning the Pennsylvania Gaming Control Board and the Slot Machine License fee. *See* 4 Pa.C.S. § 1902; *PAGE*, 877 A.2d at 390 n. 3. We note that the severability provision follows the general statutory construction rule that the provisions of every statute shall be deemed severable. 1 Pa.C.S. § 1925.

powers between the branches necessarily arise. Cases such as *PAGE* demonstrate that this Court takes seriously its responsibility as a coordinate and equal branch of government, while showing a measure of appropriate deference to the legislative branch when it comes to matters affecting the mechanics of bills and the legislative process.[29] It is worth noting that, in our system of government, although this Court decidedly has the final word on constitutionality, the obligation to abide by the mandates of the Pennsylvania Constitution, including those procedural restraints governing the General Assembly found in Article III, applies to all three branches, and we do not proceed upon a cynical assumption that our sister branches do not take their constitutional obligations seriously. It is within the power, and arguably it is the duty, of each individual legislator, and the Governor, to consult his or her own conscience about the constitutionality of proposed legislation in deciding whether to support it or endorse it.

■■■ We also note that, in our democratic form of government, there are other methods, besides lawsuits, which may serve as a corrective tool for legislative excesses, the primary method being the political process itself. This case has borne out the effectiveness of that process. The legislative appellees themselves have emphasized this very point in several respects. We cannot overstate, however, that we would *not* approve patently unconstitutional legislation merely because the political process could correct it.

■■■ The strong presumption of constitutionality afforded legislative enactments includes the procedure by which legislation is enacted. *PAGE*, 877 A.2d at 393. Thus, Act 44 cannot be deemed unconstitutional unless we find that it clearly, palpably, and plainly violates the Constitution. *See id.*

29. Notwithstanding this salutary deference, this Court does not avoid its constitutional task of reviewing Article III procedural challenges, and striking down legislation which clearly and palpably violates the Constitution. For example, in *City of Philadelphia, supra,* we struck a statute as constitutionally infirm under Article III, Section 3, finding that the proposed subject of the legislation was too broad to qualify as a single subject.

A logical beginning for a discussion of Article III procedural challenges is the sequence of events surrounding the passage of Act 44. The relevant facts are matters of public record and are not in dispute. On May 3, 2005, House Bill 1521 ("HB 1521"), printer's no. 1865, a one page document, was introduced in the House of Representatives as "An A[ct] [r]elating to compensation for executive branch officials." HB 1521 contained a provision declaring its short title to be the "Executive Branch Official Compensation Act." Aside from a definitional section, HB 1521 contained a single provision which directed that no executive official could receive an annual salary exceeding the annual salary paid to the Governor. On the same date that it was introduced in the House, HB 1521 was referred to the House State Government Committee and, thereafter, it was reported as committed on May 11, 2005. It had its first consideration by the House on May 11, 2005, but was then tabled. It was given second consideration on June 6, 2005. HB 1521 was then re-referred to the House Appropriations Committee on June 6, 2005, and re-reported as committed on that date. It was given third consideration on June 8, 2005, and received final passage in the House on June 8, 2005 by a vote of 157–40.

On June 13, 2005, HB 1521 was referred to the Senate State Government Committee, and was reported as committed on June 30, 2005. HB 1521 was first considered on June 30, 2005 and received second consideration on July 1, 2005. It was then re-referred to the Senate Appropriations Committee on July 1, 2005. On July 6, 2005, HB 1521 was slightly amended and given a new printer's number (No. 2561). It remained a one-page document, and the amendment merely added a section providing that the act applied only to executive officials who took office after November 1, 2006. This amended version of HB 1521 was then re-reported to the Senate and received third consideration and final passage on July 6, 2005 by a vote of 28–22.

On July 6, 2005, the new version of HB 1521 was referred to the House Rules Committee, and reported as committed on that date. The House non-concurred in the Senate amend-

ment, and the Senate non-concurred in response, insisting on its amendment. A conference committee consisting of three members from each chamber was duly organized. On July 7, 2005, HB 1521 was altered and amended by the conference committee. The conference committee's new version of HB 1521 was now twenty-two pages long, had a new printer's number (No. 2570), and was given a new title: "A[n] A[ct] [a]mending Titles 42 (Judiciary and Judicial Procedure), 46 (Legislature) and 71 (State Government) of the Pennsylvania Consolidated Statutes, providing for compensation; and making an inconsistent repeal." This version of HB 1521 was passed by the House by a vote of 119–79, and passed by the Senate by a vote of 27–23. It was then signed into law by Governor Rendell as Act 44 in the early morning hours of July 7, 2005.

■ Before beginning our analysis, it is necessary to align the parties and *amici* into two camps based on their stated positions regarding the alleged Article III violations. The first group includes (1) Stilp, (2) Treasurer Casey, and (3) *amicus* Timothy Potts; Russ Diamond, on behalf of PA Clean Sweep, Inc.; and Eric Epstein, Coordinator of RocktheCapital.org (hereinafter, "Potts"). Collectively, this group alleges that the General Assembly violated Article III, Sections 1–4 during the passage of Act 44.[30, 31] Both Stilp and Treasurer

---

**30.** There is one caveat: Treasurer Casey "concedes" that Act 44 survives constitutional scrutiny under Article III, Section 3, noting, however, that "although the letter of Section 3 may have been followed, the General Assembly did considerable violence to its spirit." Treasurer Casey's Brief at 13.

**31.** In its *amicus* brief, Potts does not offer a detailed analysis as to how Act 44 violates the strictures of each individual constitutional provision. Rather, the thrust of its argument is that this Court's decisions announcing our approach and analysis on this subject, particularly *Consumer Party* and *PAGE*, should be reconsidered because they have led to the General Assembly falsely believing that Article III, Sections 1–4 are mere technicalities that can be circumvented, thus leading to "stealth legislation" as exemplified by Act 44.

Unlike Potts, Stilp and Treasurer Casey do not ask for reconsideration of *PAGE*, a case issued approximately one year ago. Indeed, the parties agree that *PAGE* controls the analysis that must be conducted in evaluating the present Article III challenges. The basic legal principle of *stare decisis* generally commands judicial respect for prior decisions

Casey offer slightly divergent reasons in support of this position; therefore, their arguments will be summarized separately. The second group includes (1) the remainder of the appellees, *i.e.*, Attorney General Corbett on behalf of the Commonwealth, Senator Jubelirer, and Speaker Perzel, (2) *amicus* Judge Herron, and (3) *amici* the Brown appellants. Because this group offers similar arguments defending Act 44's constitutionality in the face of the Article III challenges, we shall summarize them as one. Additionally, for ease and clarity of discussion, we will discuss the Article III, Section 3 challenge first.

## 1. Article III, Section 3 challenge

Article III, Section 3 of the Pennsylvania Constitution, entitled "Form of Bills," provides in full:

> No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

PA. CONST. art. III, § 3. This constitutional provision "sets forth dual mandates for the General Assembly which prohibits the passing of a bill that contains more than one subject and requires that the subject be clearly expressed in its title." *PAGE*, 877 A.2d at 394.

Stilp merges his arguments for the single-subject and clearly expressed title requirements. Regarding the single-subject directive, Stilp argues that the subject of the original version of HB 1521 was to ensure that no executive official

of this Court and the legal rules contained in those decisions. As recently noted by the United States Supreme Court, *"stare decisis* promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Randall v. Sorrell*, —— U.S. ——, 126 S.Ct. 2479, 2489, 165 L.Ed.2d 482 (2006) (Opinion Announcing the Judgment of the Court) (citations and internal quotations omitted). Potts has articulated no persuasive reason to overrule the approach we so recently articulated and applied in *PAGE*. This Court is disinclined to revisit such recent precedent particularly where, as here, the challenging party is an *amicus* and fails to acknowledge and argue *stare decisis* principles. *See generally id.* at ——, 126 S.Ct. at 2500 (Alito, J., concurring in part and concurring in judgment).

receive a higher salary than the Governor does. Stilp maintains that the amendments to HB 1521, which addressed compensation for all three branches of government, are not germane to this original subject. With respect to the clearly expressed title requirement, Stilp argues that the original title of HB 1521—"A[n] A[ct] [r]elating to compensation for executive branch officials"—did not place anyone on notice that Act 44 as ultimately enacted involved substantial changes to the compensation system governing all three branches of government.

Appellees counter that the General Assembly did not violate Article III, Section 3 in enacting Act 44. Appellees contend that all versions of HB 1521 maintained a single unifying subject—*i.e.*, compensation for government officials. Appellees contend that all provisions added during the legislative process were germane to this single subject. Appellees also argue that Act 44's title—"A[n] A[ct] [a]mending Titles 42 (Judiciary and Judicial Procedure), 46 (Legislature) and 71 (State Government) of the Pennsylvania Consolidated Statutes, providing for compensation; and making an inconsistent repeal"—is clear because a reasonable person could read it and discover that it amends the provisions affecting compensation provided to the Judiciary, Legislature, and state government.

In *PAGE*, this Court reaffirmed the standard for reviewing a single-subject challenge: "where the provisions added during the legislative process assist in carrying out a bill's main objective or are otherwise 'germane' to the bill's subject as reflected in its title," the single-subject stricture is satisfied. *PAGE*, 877 A.2d at 395 (quoting *City of Philadelphia*, 838 A.2d at 587). In conducting such a review, a court must not define the main objective of a bill too narrowly, and thus must afford the General Assembly considerable deference, as Article III must not become a license for the Judiciary to "exercise a pedantic tyranny" over the Legislature's efforts. *City of Philadelphia*, 838 A.2d at 588 (citing *Estate of Rochez*, 511 Pa. 620, 515 A.2d 899, 902 (1986)); *see Payne v. School Dist. of Coudersport Borough*, 168 Pa. 386, 31 A. 1072,

1074 (1895) ("Few bills are so elementary in character that they may not be subdivided under several heads...."). Conversely, there must also be limits on how broadly a main objective is defined as well as on germaneness, or else the strictures announced in Section 3 "would be rendered impotent to guard against the evils that it was designed to curtail." *City of Philadelphia*, 838 A.2d at 588 ("There must be limits ... as otherwise virtually all legislation, no matter how diverse in substance, would meet the single-subject requirement."); *see PAGE*, 877 A.2d at 395 ("Article III, Section 3 must have, however, some limits on germaneness, for otherwise virtually all legislation—no matter how diverse in substance—would meet the single-subject requirement, rendering the strictures of Section 3 nugatory."); *Payne*, 31 A. at 1074 ("[N]o two subjects are so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough.").

Here, we conclude that HB 1521 maintains a single unifying subject—regulating compensation for government officials. Specifically, the version of HB 1521 as passed adopts formulas which resulted in increased compensation for the Judiciary, the Legislature, and high-ranking executive officials, and provides a mechanism tying future compensation for state officials to the compensation provided to designated federal officials. All of the provisions contained in Act 44 are germane to the subject of regulating compensation for government officials. Accordingly, we hold that Act 44 does not clearly, palpably, and plainly violate Article III, Section 3's single-subject requirement.

Turning to the clearly expressed title challenge, this Court set forth in *PAGE* the burden that a party must overcome to sustain such a challenge: "[O]ne who seeks to declare a title unconstitutional under this provision must demonstrate either (1) that the legislators and the public were actually deceived as to the act's contents at the time of passage, or (2) that the title on its face is such that no reasonable person would have been on notice as to the act's contents." *PAGE*, 877 A.2d at 406 (quoting *Estate of Rochez*,

515 A.2d at 902). In other words, a title is constitutional "if it puts a reasonable person on notice of the general subject matter of the act." *Id.* (citing *Ewalt v. Pennsylvania Turnpike Commission*, 382 Pa. 529, 115 A.2d 729 (1955)).

Based on a simple comparison of Act 44's title with its contents, we conclude that Stilp has failed to establish an Article III, Section 3 clear expression of title violation. The title clearly indicates that Act 44 amends the provisions governing compensation paid to the members of the three branches of government. Indeed, Stilp erroneously cites the title of the unamended version of HB 1521 as the title of the Act voted on by the legislators. Furthermore, Stilp does not allege that any legislator was actually deceived as to Act 44's contents at the time of passage nor do any legislators aver being deceived by the title. Finally, the title clearly puts a reasonable person on notice of the general subject matter of the Act. Accordingly, recognizing the strong presumption of constitutionality, as we must, we hold that Act 44 passes constitutional muster under Section 3's clear expression of title requirement.

### 2. Article III, Section 1 challenge

Next, Stilp contends that Act 44 violated Article III, Section 1 of the Pennsylvania Constitution. This provision, entitled "Passage of Bills," provides:

> No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

PA. CONST. art. III, § 1. All parties agree that *PAGE* sets forth the relevant inquiry for a challenge to legislation under Article III, Section 1. Notably, the *PAGE* Court set forth a new test under this constitutional provision. First, a reviewing court must consider the original purpose of the legislation "in reasonably broad terms," compare it to the final purpose, and then decide whether there has been an alteration or amendment that changed the original purpose. Second, the court must consider whether the title and contents of the bill in its final form are deceptive. "If the legislation passes both the

purpose comparison and deception inquiries, it will pass constitutional muster." *PAGE*, 877 A.2d at 409.

Stilp maintains that the original purpose of HB 1521 was to ensure that the Governor was the highest paid executive official and that purpose was drastically altered during the amendment process. The result, he argues, was unconstitutional legislation providing large raises in compensation for the Judiciary, the General Assembly, and high-ranking executive officials. Regarding the second prong, Stilp argues that the original title of HB 1521—"A[n] A[ct] [r]elating to compensation for executive branch officials"—was deceptive as it failed to provide notice. of the substantial overhaul of the compensation paid to officials in all three branches of government.

Treasurer Casey addresses only the first prong of the *PAGE* test, arguing that the original version of HB 1521 and the enacted version of the bill share the common purpose of "compensation." The Treasurer maintains that such a purpose is too broad and general to be constitutional under Section 1's stricture, particularly in light of this Court's statement that the aim of Section 1 is "some degree of continuity in object or intention." *Id.* at 408.

In response, appellees contend that the original purpose of HB 1521, viewed in reasonably broad terms, was to provide compensation for government officials. Appellees argue that the amendments made to HB 1521 were consistent with this purpose. Moreover, appellees maintain that the title and contents of HB 1521 in its final form were not deceptive, and the record does not reflect that any legislators who voted against the bill did so. because they were unclear of its contents.

Applying *PAGE*, we first note that the original version of HB 1521, as introduced in the House on May 3, 2005, directed that the Governor be the highest paid official in the Executive branch. Considering the original purpose in reasonably broad terms, and consistently with our discussion above concerning the single subject challenge, we find that the original purpose

*of* the bill was to regulate compensation for government officials. We acknowledge that HB 1521 in final form significantly amended and expanded the original version. We find, however, that the principal object of the bill throughout the legislative process from inception to passage was regulating compensation for government officials. Accordingly, we conclude that the bill was not altered or amended to change the original purpose in passage through the Legislature.

As for the second prong of the construct announced in *PAGE,* we must consider whether the title and contents of the bill in its final form were deceptive. In accordance with our determination above concerning Stilp's clear expression of title challenge under Article III, Section 3, we find that the title of HB 1521 in final form was not deceptive as it placed a reasonable person on notice of the general subject matter of the bill. *See PAGE,* 877 A.2d at 406. Moreover, concerning the final contents, although we acknowledge that the amendments to HB 1521 were included at the end of the legislative process and were substantive, we find that the amendments were not deceptive.

Accordingly, and once again being mindful of the presumption of constitutionality, we conclude that HB 1521 was not altered or amended in passage through both legislative houses so as to change the original purpose of the bill.

### 3. Article III, Section 2 challenge

Stilp asserts that Act 44 also violated Article III, Section 2 of the Pennsylvania Constitution. This provision, entitled "Reference to Committee; Printing," states that:

No bill shall be considered unless referred to a committee, printed for the use of the members and returned therefrom.

PA. CONST. art. III, § 2.

Stilp argues that because HB 1521 was substantially altered by the amendments, the final version was required to be re-referred to committee. Stilp further asserts that the legislative history clearly indicates that the final version of HB 1521 could not have been printed and distributed to all legisla-

tors with enough time to fully review and comprehend the legislation prior to the vote on July 7, 2005.

Treasurer Casey contends that proper procedure under Section 2 requires that a bill be reported out of a standing committee in each House before the first of its three considerations in each House. The Treasurer maintains that the General Assembly violated this procedure because the final version of HB 1521 was reported out of a conference committee and then given its first and only consideration the same day that it was passed. The Treasurer's argument, like Stilp's, is based on the premise that the version of HB 1521 as passed was significantly different from the version of the bill that was referred to committee during the legislative process.

Appellees cogently respond that a constitutional challenge under Section 2 can only be sustained if an Article III, Section 1 or 3 violation is established. *PAGE,* 877 A.2d at 410 ("[A]n amended bill need not be referred to committee and considered on those separate days if the amendments are germane to, and do not wholly change, the general subject of the bill.") (quoting *Pennsylvania AFL–CIO v. Commonwealth,* 691 A.2d 1023, 1037 (Pa.Cmwlth.1997), *aff'd,* 563 Pa. 108, 757 A.2d 917 (2000)). Appellees argue that, because the General Assembly did not violate Section 1 or 3 in enacting Act 44, there can be no violation under Section 2. Moreover, appellees maintain that it is clear from the record that HB 1521 was referred to committee during the legislative process and that it was printed and distributed to all legislators prior to the vote.

It is settled that an amended bill does not need to be referred to committee, as required by Article III, Section 2, if the amendments to the bill added during the legislative process are germane to and do not change the general subject of the bill. *DeWeese v. Weaver,* 824 A.2d 364, 368 n. 7 (Pa. Cmwlth.2003); *Pennsylvania AFL–CIO,* 691 A.2d at 1037. Stilp and Treasurer Casey claim that Section 2 was violated because the subject and purpose of the original version of HB 1521 were significantly altered during the legislative process. As noted above, however, we have concluded that they failed to demonstrate a violation of Article III, Section 1 or 3. In

addition, a review of the record reveals that HB 1521 was referred to the House State Government Committee on May 3, 2005, to the House Appropriations Committee on June 6, 2005, to the Senate State Government Committee on June 13, 2005, to the Senate Appropriations Committee on July 1, 2005, to the House Rules Committee on July 6, 2005, and to a joint conference committee on July 7, 2005. Accordingly, because Stilp and Treasurer Casey have failed to establish a violation of Article III, Section 1 or 3, and because the record clearly demonstrates that the bill was referred to committee and printed for the General Assembly members, Stilp and Treasurer Casey have failed to establish an Article III, Section 2 violation.

### 4. Article III, Section 4 challenge

Stilp's final procedural challenge pertains to Article III, Section 4 of the Pennsylvania Constitution. This provision, entitled "Consideration of Bills," provides in full:

> Every bill shall be considered on three different days in each House. All amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill and before the final vote is taken, upon written request addressed to the presiding officer of either House by at least 25% of the members elected to that House, any bill shall be read at length in that House. No bill shall become a law, unless on its final passage the vote is taken by yeas and nays, the names of the persons voting for and against it are entered on the journal, and a majority of the members elected to each House is recorded thereon as voting in its favor.

PA. CONST. art. III, § 4.

Stilp maintains that the amended and final version of HB 1521 was not created, nor considered by both Houses, until July 7, 2005, the same date that it was passed and signed into law as Act 44. Therefore, according to Stilp, because the substance of HB 1521 had been altered by the amendments, the final version of HB 1521 was required to be considered on three different days in each House.

Treasurer Casey concedes that under *PAGE,* a violation of Section 4 cannot be established unless either Article III, Section 1 or 3 has also been violated. *PAGE,* 877 A.2d at 410. Consistent with his assertion that Section 1 was violated, however, the Treasurer maintains that the final version of HB 1521 changed the purpose of the original version, and therefore the consideration of the original bill became a nullity. Thus, the Treasurer argues, the General Assembly was required to consider the final version on three different days in each House in accordance with Section 4. The Treasurer argues that because each house of the General Assembly considered and voted on the final version of HB 1521 on only one day, Section 4 was violated.

Appellees' response is similar to their answer concerning the Article III, Section 2 challenge. Specifically, appellees contend that in order to establish an Article III, Section 4 violation, an Article III, Section 1 or 3 violation must first be demonstrated by the challenger. *Id.* Appellees argue that because Stilp and Treasurer Casey have failed to establish a Section 1 or 3 violation, their challenge under Section 4 must also fail. Moreover, appellees maintain that the record clearly demonstrates that HB 1521 was considered on three separate days in each House during the legislative process.

Similar to an Article III, Section 2 challenge, it is settled that a bill does not have to be considered on three separate days, as otherwise required by Article III, Section 4, if the amendments to the bill added during the legislative process are germane to and do not change the general subject of the bill. *Id.*; *DeWeese,* 824 A.2d at 368 n. 7; *Pennsylvania AFL–CIO,* 691 A.2d at 1037. Our analysis for this claim, therefore, is identical to our analysis of the Section 2 claim. Thus, because Stilp and Treasurer Casey claim that Section 2 was violated because HB 1521 was significantly altered during the legislative process, they must first establish a violation of Article III, Section 1 or 3, which they have failed to do. In addition, a review of the record reveals that HB 1521 was considered on three separate days in the House (May 11, June 6, and June 8, 2005), and three separate days in the Senate

(June 30, July 1, and July 6, 2005). Accordingly, because Stilp and Treasurer Casey have failed to establish a violation of Article III, Section 1 or 3, and because the bill was read on three different occasions, Stilp and Treasurer Casey have failed to establish an Article III, Section 4 violation.

### E. Legislative Unvouchered Expense Allowances and *Consumer Party*

Stilp's last constitutional challenge concerns, not the entirety of Act 44, but the legislative unvouchered expense allowance provision. *See* Act 44, § 2 (amending 46 Pa.C.S. § 1107). This provision reads as follows:

§ 1107. Additional expenses

**(a) Senate.**—

(1) Beginning on the effective date of this subsection and ending November 30, 2008, a member of the Senate shall receive monthly, in addition to any allocation for clerical assistance and other actual expenses, an unvouchered expense allocation in the amount of 1/12 of the difference between:

(i) the amount specified for a member in:

(A) section 1102(a) (relating to members of the General Assembly) plus section 1104 (relating to cost of living) as appropriate; or

(B) section 1103(a) (relating to legislative officers and leaders) plus section 1104 as appropriate; and

(ii) the amount calculated for that member as of the effective date of this subparagraph pursuant to the act of September 30, 1983 (P.L. 160, No. 39), known as the Public Official Compensation Law.

(2) This subsection shall expire November 30, 2008.

**(b) House of Representatives.**—

(1) Beginning on the effective date of this subsection, a member of the House of Representatives may receive each month, in addition to any allocation for clerical assistance and other actual expenses, an unvouchered expense allocation in the amount of 1/12 of the difference between:

(i) the amount specified for a member in:

(A) section 1102(b); or

(B) section 1103(b) as appropriate; and

(ii) the amount calculated for that member as of the effective date of this subparagraph pursuant to the Public Official Compensation Law.

(2) The Rules Committee of the House of Representatives shall determine the procedure by which a member of the House of Representatives may receive an allocation under this subsection.

(3) This subsection shall expire November 30, 2006.

Act 44, § 2 (amending 46 Pa.C.S. § 1107) (footnote omitted).

Specifically, Stilp contends that the unvouchered expense allowances provided in Act 44 violate Article II, Section 8 of the Pennsylvania Constitution. This provision, entitled "Compensation," reads as follows:

The members of the General Assembly shall receive such salary and mileage for regular and special sessions as shall be fixed by law, and no other compensation whatever, whether for service upon committee or otherwise. No member of either House shall during the term for which he may have been elected, receive any increase of salary, or mileage, under any law passed during such term.

PA. CONST. art. II, § 8.

Stilp maintains that Act 44's unvouchered expense allowances are an unconstitutional attempt to circumvent Article II, Section 8's express proscription against a mid-term increase in legislative salary by allowing incumbent legislators to secure pay raises immediately without waiting for the next election. Stilp highlights two mechanical aspects of the allowances that, in his view, unquestionably prove that the allowances are a *de facto* salary increase. First, he notes that the unvouchered expenses authorized in Act 44 equaled the exact dollar-for-dollar amount of the increase in legislative salaries provided under the formula adopted by Act 44 and which were to take effect after the next election for each individual legislator. Indeed, the amount of the unvouchered expense allowance was

not expressed in dollar terms, but only with reference to the equivalent percentage of the future salary increase. Second, Stilp notes that the unvouchered expenses expired at different times, depending upon the election cycle. Thus, the expenses were available from July 7, 2005 (the effective date of Act 44) until November 30, 2006 for members of the House, all of whose seats would be up for election in the 2006 general election. For Senators, however, the expenses were made available until November 30, 2006 or November 30, 2008, depending on the term of office for each Senator. Concisely, Section 2 of Act 44, amending 46 Pa.C.S. § 1107, permitted legislators to immediately receive, as unvouchered expenses, the precise amount of their future salary increase until their actual salary increases took effect following each legislator's next election. Furthermore, Stilp argues that the unvouchered expense allowances were not intended as compensation for actual expenses incurred by legislators; in this regard, he asserts, the $7,500 in vouchered expenses already provided to legislators each year is more than adequate to cover actually incurred expenses.[32, 33]

32. Alternatively, Stilp argues that if this Court does not find the unvouchered expense provision unconstitutional, the portion of the provision which allows for additional unvouchered expenses for legislative leadership and committee service must independently be deemed unconstitutional under Article II, Section 8. This argument is premised on that part of Act 44 which provides higher salaries for leadership and committee service on top of the formula which increased the salaries provided to rank-and-file legislators. *See* Act 44, § 2 (amending 46 Pa.C.S. § 1103). Stilp notes that, because legislative officers and leaders receive higher salaries than rank-and-file legislators, the amount of unvouchered expenses provided to them is also greater since the unvouchered expenses are based on each legislator's future salary. In light of our disposition of these matters, we do not reach this distinct argument.

33. Respecting remedy, Stilp maintains that all members of the General Assembly who elected to take the unvouchered expenses following passage of Act 44 must return those payments if they have not done so already. We disagree. Any legislator who elected to receive unvouchered expense allowances acted in good faith reliance on the presumption of Act 44's constitutionality. *See City Deposit Bank & Trust Co. v. Zoppa*, 336 Pa. 379, 9 A.2d 361, 362 (1939) ("Acts done pursuant to statute may be sustained though it be subsequently held unconstitutional.").

In connection with his contention that the unvouchered expense provision is unconstitutional, Stilp argues that this Court's decision in *Consumer Party*, 510 Pa. 158, 507 A.2d 323, which approved the General Assembly's use of unvouchered expenses in prior compensation legislation, must be overruled. Stilp also argues that we should disapprove of two Commonwealth Court cases which relied on *Consumer Party* to uphold unvouchered expense provisions enacted in subsequent compensation legislation. *See Stilp v. Commonwealth*, 699 A.2d 1353 (Pa.Cmwlth.1997); *Kennedy v. Commonwealth*, 119 Pa.Cmwlth. 24, 546 A.2d 733 (Cmwlth.1988) (*en banc*). Stilp initially maintains that the portion of *Consumer Party* approving unvouchered expenses was actually *dicta* because the issue was not properly before the Court. Stilp argues that *dicta* has no precedential value, and that *Kennedy's* and *Stilp's* repetition of the *Consumer Party dicta* did not elevate that *dicta* into precedent. *See Commonwealth v. Perry*, 568 Pa. 499, 798 A.2d 697, 715 (2002) (Castille, J., concurring) ("*Dicta* is not converted into binding constitutional precedent through repetition.").

Stilp alternatively argues that even if *Consumer Party*, *Kennedy*, and *Stilp* are deemed to be binding precedent, they must be overruled because they are incorrect to the extent they hold that mid-term provisions for legislative unvouchered expenses are constitutional. *See* Stilp's Brief at 22 (citing *Mayle v. Pa. Dept. of Highways*, 479 Pa. 384, 388 A.2d 709, 720 (1978) ("[T]he doctrine of stare decisis is not a vehicle for perpetuating error, but rather a legal concept which responds to the demands of justice and, thus, permits the orderly growth processes of the law to flourish. . . .")). Lastly, Stilp maintains that this Court must specifically direct the General Assembly never to include a legislative unvouchered expense provision in future pay raise legislation.

Treasurer Casey again aligns himself with Stilp on this issue. Specifically, he agrees with Stilp that Act 44's unvouchered expense provision violates Article II, Section 8 of the Pennsylvania Constitution because it is a mid-term salary increase; that *Consumer Party* must be overruled; and that

the legislators who took the unvouchered expenses prior to Act 72's repeal of Act 44 must repay the payments.

In its *amicus curiae* brief, Potts emphasizes, as Stilp does, that the unvouchered expense allowances are not paid for actual business expenses incurred by legislators, and that the allowances in this legislation equaled the exact amount of salary increases that were to take effect upon the next election for each individual legislator. Therefore, according to Potts, the unvouchered expense allowances in Act 44 are salary merely disguised under a different name. Potts additionally invites this Court to overrule *Consumer Party* and clarify that unvouchered expenses are unconstitutional and an improper circumvention of Article II, Section 8 of the Pennsylvania Constitution.

In response, the remaining appellees—which include Attorney General Corbett on behalf of the Commonwealth, Senator Jubelirer, and Speaker Perzel—maintain that the Article II, Section 8 challenge must be rejected under both *Consumer Party* and the doctrine of *stare decisis*. Specifically, appellees argue that mid-term provisions for legislative unvouchered expense allowances do not constitute salary or mileage under our holding in *Consumer Party*, and thus are outside the scope of Article II, Section 8 of the Pennsylvania Constitution. Appellees also argue that Stilp has failed to satisfy the necessary burden for this Court to overrule *Consumer Party*. Senator Jubelirer and Speaker Perzel then offer additional, substantive reasons in support of these general arguments.

Senator Jubelirer initially acknowledges that there are some differences between the unvouchered expenses upheld in *Consumer Party* and those provided in Act 44, most notably that the unvouchered expense allowances upheld in *Consumer Party* were not in an amount equal to the future salary increase. But, the Senator maintains that the differences are immaterial and, thus, the doctrine of *stare decisis* requires this Court to uphold Act 44's unvouchered expense provision and reaffirm *Consumer Party*. The Senator asserts that the General Assembly relies upon this Court's precedent in enacting legislation, and that the overruling of *Consumer Party*

"would cast uncertainty and confusion regarding a fundamentally important legislative function." Senator Jubelirer's Brief at 31.

For his part, Speaker Perzel maintains that Act 44's unvouchered expense provision complies with *Consumer Party*, and that the General Assembly acted in good faith reliance on this precedent in enacting the provision. The Speaker acknowledges that this Court has appeared to be "uneasy" with *Consumer Party*, pointing to: the recent decision in *PAGE* which overruled the legal standard announced in *Consumer Party* for evaluating Article III, Section 1 original purpose challenges; and the phrasing of the portion of our Order of December 22, 2005 concerning the unvouchered expense issue. Given this perceived "uneasiness" with *Consumer Party*, the Speaker maintains, "the Legislature, as a practical concern, requires guidance and clarification from the Court for any future legislation . . . [and] a dependable ruling on the requirements of Article II, Section 8, and most directly concerning the continued constitutionality of those unvouchered expense allocations in the amount of the future pay raise." Speaker Perzel's Brief at 26.

This Court reviews constitutional challenges to a statute under the presumption that the General Assembly does not intend to violate the Constitution; accordingly, a statute enjoys a strong presumption of constitutionality. *See* 1 Pa.C.S. § 1922(3); *PAGE*, 877 A.2d at 393. Any party challenging the constitutionality of a statute bears the heavy burden of proving that the act clearly, palpably, and plainly violates the Constitution, and all doubts are to be resolved in favor of a finding of constitutionality. *PAGE*, 877 A.2d at 393. In construing constitutional provisions, "the fundamental rule of construction which guides [the Court] is that the Constitution's language controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *Ieropoli*, 842 A.2d at 925.

All parties involved agree that Article II, Section 8 of the Pennsylvania Constitution plainly and unequivocally prohibits legislators from receiving mid-term salary increases. The

issue then is whether the mid-term legislative unvouchered expense allowance authorized by Act 44 is in fact a salary increase, and therefore is repugnant to the Constitution. Our analysis necessarily begins with *Consumer Party.*

*Consumer Party* involved Act 39 of 1983 ("the Public Official Compensation Law"), a comprehensive law that, similar to Act 44, addressed the compensation of officials in all three branches of government. Section 4 of the Act raised the salaries of members of the General Assembly by $10,000, to a total of $35,000 per annum, made effective following the next election. Section 4 also authorized $7,500 in vouchered expenses for "clerical assistance and other expenses incurred during [a legislator's] term in connection with the duties of his office." Act 39, § 4(a); *see Consumer Party,* 507 A.2d at 327 n. 3. Section 5 of Act 39 also provided for an **unvouchered** expense allowance in a total amount of $5,000, but payable mid-term, in monthly allotments over a one-year time period from December 1, 1983 until November 30, 1984. *See* Act 39, § 5(a); *Consumer Party,* 507 A.2d at 327 n. 4. In addition, Officers of both the Senate and the House of Representatives were to receive additional amounts of unvouchered expenses for the same one-year time period. Act 39, § 5(b), (c); *Consumer Party,* 507 A.2d at 327 n. 4.

The citizen-taxpayer appellants in *Consumer Party* appealed from a Commonwealth Court order which, on summary judgment, upheld the constitutionality of Act 39. After reviewing and rejecting various procedural challenges raised under Article III, this Court turned to the appellants' challenge to Act 39's legislative unvouchered expense provision. The appellants had argued in the Commonwealth Court only that the provision violated Article III, Section 27 of the Pennsylvania Constitution, entitled "Changes in Term of Office or Salary Prohibited," and which provides that: "No law shall extend the term of any public officer, or increase or diminish his salary or emoluments, after his election or appointment." We held that this challenge was meritless because the more specific provision in Article II, Section 8 exclusively covers mid-term compensation increases for the Legislature.

*Consumer Party,* 507 A.2d at 335–36 (citing *Snyder v. Barber,* 378 Pa. 377, 106 A.2d 410, 411 (1954) (Article III, Section 27 (formerly numbered "13") "does not apply to the members of the Legislature since their compensation is dealt with in a separate part of the Constitution, namely, Art. II, sec. 8.")).

The *Consumer Party* Court then went on to note that, in their brief on appeal, the appellants attempted to raise a new claim alleging that the unvouchered expense provision violated Article II, Section 8. We determined that this distinct issue was "not properly before the Court" because it was never raised in the complaint below nor did the appellants seek to amend their complaint to raise the claim. *Id.* at 336.

Notwithstanding this waiver holding, the *Consumer Party* Court went on to address and reject the Article II, Section 8 challenge on the merits, without stating if the discussion was intended as *dictum,* an alternative holding, or merely to provide guidance for future cases. The Court noted that Article II, Section 8 prohibits mid-term increases in legislative "salary" or "mileage," but is silent about unvouchered expense allowances. The Court understood the (waived) challenge before it to be that "the increased expense allowance during the legislative term provided for in the Compensation Act is additional 'salary.'" Engaging in a plain meaning analysis, the Court found that this argument ignored the clear differences in the terms "salary" and "unvouchered expense allowances," as the former entailed "compensation for services performed," while the latter covered "an amount furnished to pay for expenses incurred in the performance of those services." The Court also noted that expense allowances for legislators had been provided by statute since 1956, and that there was also statutory precedent for mid-term augmentation of such allowances. *Id.* at 336–37.

The Court then examined the nature of expense allowances. The Court highlighted the disadvantages of a system where an employee is required to submit vouchers for all expenses, including: the concomitant bookkeeping burden a vouchered system requires for the employer, the time-lag between the employee's expenditure and reimbursement by the employer,

and the time expended by the employee in maintaining accurate expense records. The Court further noted that an unvouchered system, providing for a fixed allowance, avoids these burdens: "[t]he time and expense involved in bookkeeping is eliminated and the employee is able to devote his full attention to his duties." *Id.* The Court also recognized that an employee's unvouchered expenditures might be more or less than the fixed allowance, but concluded that such variations were not problematic: "As long as the expense allowance fixed is reasonably related to actual expenses, the lack of mathematical precision inherent in such a system does not present a problem." *Id.* at 337.

Finally, the *Consumer Party* Court considered the appellants' argument that the unvouchered expense allowance was "unreasonable" and "in reality a veiled salary increase" which violated Article II, Section 8. The Court did not reject this claim out of hand, but did so for the following, specific reasons:

Appellants offer no basis for the conclusion that the expense allowance is not needed and will not be used to pay for the legitimate expenses of the members of the General Assembly. As we previously outlined, the use of expense allowances has long been a tradition in the legislature. Instead appellants argue that those legislators should bear the burden of proving that the expense allowance is reasonable. We disagree with that novel assertion.

As we stated above, a party challenging the constitutionality of an act of the General Assembly bears a heavy burden of proof, and legislation will not be declared unconstitutional unless it clearly, palpably and plainly violates the Constitution. Here appellants utterly failed to make any showing that the expense allowance is a sham. This additional argument is therefore meritless.

*Id.* at 337–38 (citations and footnote omitted).

In the twenty years since *Consumer Party* was decided, the Commonwealth Court has twice been called upon to assess Article II, Section 8 challenges to pieces of legislation involv-

ing official compensation, legislation that also authorized legislative unvouchered expenses. In both instances, the lower court looked to *Consumer Party* for guidance and ultimately rejected the constitutional challenge. It is notable that, in both cases, further review was not sought before this Court. *See Stilp,* 699 A.2d 1353; *Kennedy,* 119 Pa.Cmwlth. 24, 546 A.2d 733.

In *Kennedy,* the challenged legislation, among other subjects, increased the salaries of legislators by $12,000, to a total of $47,000 per annum, effective after the next election. The legislation also provided for a mid-term unvouchered expense allowance to be paid monthly in the interim, and in an amount equal to the future salary increase (*i.e.,* $1,000 per month). Applying *Consumer Party,* the *en banc* panel held that the unvouchered expenses were not a "salary hike" and thus did not violate Article II, Section 8. In so holding, the *Kennedy* court noted that *Consumer Party* had: emphasized the distinction between "salary" and "expenses;" taught that, as long as the expense allowance is reasonably related to actual expenses, mathematical precision is unnecessary; and placed the burden of proving unreasonableness upon the challenger. The *en banc* panel then summarily rejected the claim as follows:

> In this case, Petitioners' complaint does not plead that the $1,000.00 expense increase is unreasonable and that a lesser amount would be reasonable. Instead, it attacks, on constitutional grounds, the increase in its entirety as one which is, in reality, a salary hike. We conclude that the above-quoted language [from *Consumer Party*] is controlling upon the issue presented here and, thus, fatal to Petitioners' theory of a constitutional violation of Article II, section 8.

*Kennedy,* 546 A.2d at 737.

The Commonwealth Court also rejected a similar constitutional challenge in *Stilp,* 699 A.2d 1353. The public official compensation legislation at issue in that case (Act 51 of 1995) again provided for a mid-term legislative unvouchered expense allowance, to be paid monthly, and in an amount equal to the legislative salary increase made effective following the next

election.[34] The legislation further provided to Senators who were elected in 1994 continued unvouchered expenses from December 1, 1996 until November 30, 1998 in an amount equal to their salary increase. Citing *Consumer Party* and *Kennedy,* the panel rejected Stilp's argument that the increase in expense allowances should be considered a salary increase on grounds that the increase was calculated under the same formula used for the legislators' cost-of-living adjustments ["COLAs"]:

> Merely because the expense allowances and COLAs are determined by using the same formula does not automatically transform the expense allowances into additional salary. Moreover, the COLAs and the expense allowances are calculated using the Consumer Price Index for Urban Consumers. Section 4 of the Law. In our view, it is not unreasonable to augment the Legislators' expense allowance and salary in proportion to actual increases in the cost of living measured by the consumer price index.

*Id.* at 1357. Finally, the panel also rejected Stilp's argument that the unvouchered expense allowances were not reasonably related to actual expenses incurred by legislators:

> A fair reading of *Consumer Party* does support the view that an unreasonable expense allowance could be unconstitutional. The *Consumer Party* Court indicated that a plaintiff asserting that an expense allowance is unreasonable has a heavy burden to prove that the challenged expense allowance is, in reality, not needed and not intended to pay for the legitimate expenses of Legislators, and that it is a sham designed to hide a salary increase. Stilp, however, has not averred any facts in his complaint that could support a cause of action on the theory that the Act 51 expense allowance is unreasonable.

*Id.* (footnote omitted).

Act 44 is similar to the legislation at issue in *Consumer Party, Kennedy* and *Stilp* in that the challenged provision provides for mid-term payments for unvouchered expenses

---

**34.** Under the unvouchered expense provision, rank-and-file legislators received $733 per month.

(not salary or mileage); the unvouchered expense provision is contained in a bill establishing an increase in legislative salaries to take effect after the next election; and the unvouchered expense allowance expires once the legislative salary increase takes effect. There are notable distinctions, however. First, Act 44's unvouchered expense provision does not state an absolute dollar amount of expenses to be afforded legislators. Instead, the amount of the allowance is determined by a formula that refers precisely to the future increase in legislative salary, *i.e.*, the dollar difference between pre-Act 44 legislative salaries and the new salaries that would take effect following the next relevant legislative election. Second, with respect to legislative leaders, the corresponding raw dollar amount of the unvouchered expense allowance was substantially more than was at issue in any of the previous cases. Under the formula adopted by Act 44, the future salary of rank-and-file members of the General Assembly would rise over $11,000, from just under $70,000 per year to just over $81,000 per year. Thus, the mid-term "unvouchered expenses" authorized by the Act are in excess of $11,000 for each rank-and-file legislator. The amount of mid-term unvouchered expenses made available to legislative leaders and committee chairs, however, was much more dramatic. For example, Act 44 adopted a formula that raised the salaries of the Speaker of the House and the Senate President *pro tempore* by well over $30,000 per year, and made that very same amount immediately available to those legislators in the guise of mid-term unvouchered expenses.

This Court asked the parties to brief the question of whether we should reconsider or overrule *Consumer Party* and Stilp, Treasurer Casey, and Stilp's *amici* affirmatively request that we do so. The doctrine of *stare decisis* maintains that for purposes of certainty and stability in the law, "a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same, even though the parties may be different." *Burke v. Pittsburgh Limestone Corp.*, 375 Pa. 390, 100 A.2d 595, 598 (1953). While *stare decisis* serves invaluable and salutary principles, it is not an inexorable command to be followed blindly when such

adherence leads to perpetuating error. *See Mayle*, 388 A.2d at 720 ("[T]he doctrine of stare decisis is not a vehicle for perpetuating error, but rather a legal concept which responds to the demands of justice and, thus, permits the orderly growth processes of the law to flourish."). On the other hand, we recognize the importance of reliance on settled jurisprudence when asked to overturn precedent, and thus there is much force in the legislative leaders' argument that they rely on this Court's interpretation of the law and precedent when crafting legislation, and that such reliance should not be undercut except for good reason.

Preliminarily, we should note that, although it is not clear whether the analysis articulated and applied in discussing the Article II, Section 8 challenge in *Consumer Party* was intended as *dicta*, general guidance, or an alternative holding, we would not seek to distinguish or narrow it on grounds that it lacked precedential value. The Court saw fit to discuss the constitutional issue, without objection from any participating Justice; the discussion was offered as an explanation of why "[n]o purpose would be served" in permitting amendment of the complaint to add the waived argument; the issue thus discussed was an important one obviously capable of recurrence; and it has been relied upon. Thus, we shall consider the case square-on.

*Consumer Party* assumed an appropriate deference to the judgment of the General Assembly with respect to mid-term increases in expense allowances, in part because of the salutary presumption of constitutionality, and in part because the Court perceived the legitimate role that unvouchered expenses play where they bear a reasonable relationship to actual expenses. Indeed, the Court addressed at length the putative advantages in not requiring a dollar-for-dollar accounting of expenses. The Court's analysis, however, did not purport to approve of any and all systems covering mid-term unvouchered expenses. To the contrary, the Court made clear that such expenses must bear a "reasonable relationship" to actual expenses. We see no constitutional infirmity in this general standard as adopted in *Consumer Party*. Expenses

**are** different from salary. There is, of course, much to be said for transparency in government, particularly when it comes to expenditures, and specific accounting procedures promote that transparency even if such a system requires an expenditure of time and money for accounting purposes. But, absent constitutional infirmity, it is not this Court's role to dictate to a coordinate, coequal branch of government how best to approach the task of accounting for legitimate expenses. Thus, we continue to believe that, as a general matter, unvouchered expense allowances are not *per se* unconstitutional. Accordingly, we reaffirm the core reasonable relationship standard which was adopted in *Consumer Party*.[35]

Having said this, however, we have no difficulty in finding that the unvouchered expense allowance provided for

---

**35.** Our reaffirmation of *Consumer Party's* recognition that mid-term unvouchered expenses are not *per se* unconstitutional, and the reasonable relationship standard as the constitutional measure of such legislation, is not an endorsement of the Court's application of the test in that case. Mr. Justice Saylor's Concurring and Dissenting Opinion—which emphasizes the sheer amount of the unvouchered allocation at issue in *Consumer Party* and the Court's lack of concern with whether the allotments were reported as income or expenses on federal tax returns—ably outlines the strong argument that could be made that the *Consumer Party* Court's application of the test it announced was excessively deferential, perhaps even implausible under the circumstances. We could add, to the points offered by Justice Saylor, the circumstance that the unvouchered expenses expired once the legislative salary increases took effect. As we explain below, however, the circumstances in this case are not at all the same as in *Consumer Party*, and thus, to discharge our duty in the case *sub judice* it is not necessary to speculate as to whether we would approve the mid-term unvouchered expense legislation at issue in *Consumer Party*, if faced with it again.

Perhaps more importantly, it is also worth noting in any digression into whether *Consumer Party* was rightly decided that the propriety of a former decision is difficult to measure in absolute terms, and the effects of hindsight must be considered. As a matter of law, the *Consumer Party* Court rejected only the constitutional challenge and argument it identified as having been presented to it; no case purports to reject all possible arguments. In assessing the persuasiveness of a prior decision, a later court necessarily is confined to the arguments and discussion which are identified in the decision. Thus, the excessive deference now apparent in *Consumer Party* may well reflect the narrowness or insufficiency of the argumentation forwarded in the case, or it could represent the Court's failure to address or appreciate all arguments forwarded.

in Act 44 is constitutionally infirm as it does not bear a reasonable relationship to the actual expenses incurred by individual legislators. To better frame the inquiry, we begin by emphasizing what the Court in *Consumer Party* did **not** say. In point of fact, the amount of the unvouchered expense allowance at issue in *Consumer Party* was not the same as the future legislative salary increase provided in that legislation (the salary increase was $10,000, while the unvouchered expense allowance was half that amount). More importantly, this Court never held, stated, or implied that any particular amount authorized for mid-term unvouchered expenses was constitutionally valid under the reasonable relationship standard and Article II, Section 8 of the Pennsylvania Constitution. Equally as important, and contrary to the present argument of the Speaker, this Court certainly did not hold, state or imply that mid-term unvouchered expense allowances for the Legislature comply with Article II, Section 8 so long as they are in the same amount as a future salary increase included in the same legislation. Thus, when the Speaker asks for a "dependable" Article II, Section 8 ruling on "the **continued** constitutionality of those unvouchered expense allocations **in the amount of the future pay raise**," Speaker Perzel's Brief at 26 (emphasis added), he has misperceived the inquiry. *Consumer Party* never said or suggested that such a system was constitutionally valid.

Senator Jubelirer, in his summary of *Consumer Party*, notes the reasonable relationship test stated therein, but he never argues that such a relationship exists with respect to Act 44. Speaker Perzel, on the other hand, never acknowledges this standard set forth in *Consumer Party*, instead focusing upon the facts alone, and suggesting incorrectly that the case thereby stands for the proposition that mid-term unvouchered expenses are constitutional under Article II, Section 8 so long as they are in the same amount as the future legislative salary increase provided in the legislation. Because the legislative leaders overlook or misconstrue the actual holding of *Consumer Party*, they provide no relevant rebuttal

to Stilp's claim.[36]

This Court recognizes that, as the challenger of presumptively constitutional legislation, Stilp properly bears the burden of proof here. *Consumer Party,* 507 A.2d at 337. However, it is notable that the legislative parties do not dispute his claim that the unvouchered expenses authorized by Act 44 are not reasonably related to the actual, and otherwise-unreimbursed, expenses incurred by legislators in the discharge of their public duties. Moreover, if the unvouchered expense allowance could plausibly be explained as intended to cover actual expenses, rather than to serve as additional salary, we have no doubt that this proposition would be an easy matter for the legislative parties to demonstrate. And, as the parties uniquely in a position to provide such proof, the failure to so argue, or to forward such a proffer, is significant notwithstanding Stilp's ultimate burden. Also, with respect to Stilp's burden of proof, we are presented with arguments that were not forwarded or discussed in *Consumer Party,* including Stilp's focus on the fact that the staggered timing of the expiration of the unvouchered expenses prove they serve as additional salary. Stilp also properly relies on the fact, which was not available to the challengers in *Consumer Party,* of intervening legislation, such as was at issue in *Kennedy* and *Stilp,* which tied the amount of mid-term provisions for unvouchered expenses precisely to the amount provided as a future increase in legislative compensation, and provided that the unvouchered expenses would expire once the new salaries took effect. The practice has become so fixed, indeed, that the Speaker, in this case, has misread *Consumer Party* itself as approving any amount of mid-term unvouchered expense allowance so long as the amount is the same as the future

**36.** It appears that in both *Kennedy* and *Stilp,* unlike in *Consumer Party,* the unvouchered expenses authorized were in the same amount as the future legislative salary increase. This Court, however, was not asked to review either case and those intermediate appellate decisions do not bind us. In any event, neither *Kennedy* nor *Stilp* held that dollar-for-dollar equivalence *per se* established a reasonable relationship between the unvouchered expense allowance and actual expenses.

increase in salary, even though the case said no such thing, and the facts could not have supported such a holding.[37]

In any event, any claim of a congruence between actual unreimbursed expenses incurred by legislators and the unvouchered allowances provided under Act 44 to defray those expenses would challenge belief, and particularly with respect to the unvouchered expense allowances made available to legislative leaders. The $11,000 provided the rank-and-file was on top of, and well in excess of, the $7,500 already provided for vouchered expenses, and indeed represented approximately 16% of their then-authorized salaries. The amount of unvouchered expenses provided legislative leaders (the Speaker and Senate President *pro tempore*, and the majority and minority leaders), meanwhile, was well in excess of $30,000 (three times the unvouchered expenses provided to the rank-and-file), and represented over 30% of their existing salaries.

In light of Stilp's unrebutted argument, appellees' silence on *Consumer Party's* reasonable relationship test, the reference to the new salary formula to compute the mid-term unvouchered expense allowance, the dollar-for-dollar congruence between the unvouchered expense allowance and the new salary formula, the fact that the expense allotment expires once the new salary takes effect, and the sheer amount of the authorized allowance, we hold that Stilp has carried his burden of proving that the legislative unvouchered expense allowance provided in Act 44, § 2 (amending 46 Pa.C.S. § 1107), in fact represented a mid-term increase in legislative salary which clearly, palpably, and plainly violated the proscription in Article II, Section 8 of the Pennsylvania Constitution. Accordingly, we will grant the relief requested by Stilp, in part, and declare Section 2 of Act 44 amending 46 Pa.C.S. § 1107 unconstitutional.

**37.** We should note that we obviously disagree, respectfully, with Mr. Justice Saylor's characterization of the legislative allotments at issue in *Kennedy* and *Stilp* as taking *Consumer Party* to its "logical extreme." As we have explained in text, the position of the legislative leaders respecting what *Consumer Party* approved is premised upon a misreading of the case.

### F. Nonseverability Provision

### - 1 -

The final interpretive issue, arising by virtue of our finding above that the unvouchered expense allowance in Act 44 is unconstitutional, is the legal effect of the nonseverability provision included in the Act. That the Act contains a **nonseverability** provision is remarkable in and of itself, because the general rule set forth in Section 1925 ("Constitutional construction of statutes") of the Statutory Construction Act, 1 Pa.C.S. § 1501 *et seq.*, establishes a presumption of severability:

> The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

1 Pa.C.S. § 1925. This Court has deemed the presumption in Section 1925 so fundamental to our task, when confronted with a finding that a provision of a statute is invalid, that we have invoked Section 1925 even where the parties failed to argue severability. *See, e.g., Mockaitis,* 834 A.2d at 502. In addition to applying to "every" statute and employing mandatory terms, Section 1925 is notable because it is not merely boilerplate. Thus, Section 1925 does not mandate severance in all instances, but only in those circumstances where a statute can stand alone absent the invalid provision. Section 1925 sets forth a specific, cogent standard, one which both emphasizes the logical and essential interrelationship of the void and valid

provisions, and also recognizes the essential role of the Judiciary in undertaking the required analysis.

Though now embodied in a legislative command, the principle of severability, and the standard by which severability is measured, has its roots in the common law. For example, in *Rothermel v. Meyerle*, 136 Pa. 250, 20 A. 583 (1890), this Court stated the following standard:

A statute may be void only so far as its provisions are repugnant to the constitution. One provision may be void, and this will not affect other provisions of the statute. If the part which is unconstitutional in its operation, is independent of, and readily separable from, that which is constitutional, so that the latter may stand by itself, as the reasonable and proper expression of the legislative rule, it may be sustained as such; but, if the part which is void is vital to the whole, or the other provisions are so dependent upon it, and so connected with it, that it may be presumed the legislature would not have passed one without the other, the whole statute is void.

*Id.* at 587–88. The standard now contained in Section 1925 merely codified this settled decisional law.

The practice of severing and striking only the unconstitutional provision of a larger legislative enactment, in instances where the legislation is otherwise self-sustaining and valid, has its origins in principles of jurisprudential restraint. *See generally* John Copeland Nagle, *Severability*, 72 N.C. L. Rev. 203, 212–18 (1993); *accord* Fred Kameny, *Are Inseverability Clauses Constitutional?*, 68 Alb. L. Rev. 997, 1002 (2005). The development of the doctrine has been described as follows:

The *Champlin* [38] test has its origins in Chief Justice Lemuel Shaw's 1854 opinion for the Supreme Judicial Court

---

**38.** *Champlin Refining Co. v. Corporation Commission*, 286 U.S. 210, 234, 52 S.Ct. 559, 564–65, 76 L.Ed. 1062 (1932), *overruled by Phillips Petroleum Co. v. Okla.*, 340 U.S. 190, 71 S.Ct. 221, 95 L.Ed. 204 (1950). Under *Champlin*, the severability of a statute depends upon two factors: legislative intent, and whether the statute can function without the offending provision. This Court has employed the same standard. *See, e.g., Saulsbury v. Bethlehem Steel Co.*, 413 Pa. 316, 196 A.2d 664, 667

of Massachusetts in *Warren v. Mayor & Aldermen of Charlestown*, [68 Mass. 84, 2 Gray 84 (1854),] the first case holding that an unconstitutional statutory provision rendered an entire statute invalid. Prior to *Warren*, the severability of statutory provisions was usually assumed. In the earliest cases questioning the constitutionality of a federal statute, the United States Supreme Court gave no indication that the unconstitutionality of one provision—or its application—would render an entire statute invalid. In *Marbury v. Madison*, [5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803),] for example, the unconstitutionality of section 13 of the Judiciary Act of 1789 did not render the entire Act invalid. As Chief Justice Marshall later wrote, "If any part of the act be unconstitutional, the provisions of that part may be disregarded while full effect will be given to such as are not repugnant to the constitution of the United States...." [39] As a result of this lack of guidance, some courts invalidated statutes "so far as" they were unconstitutional, while a few courts suggested that severability depended on the ability of the remaining provisions to function absent the unconstitutional provision.

Then came *Warren*. ... Chief Justice Shaw agreed with those courts that had found that a statute could be constitutional in part and unconstitutional in part. But he quickly added:

> [T]his must be taken with this limitation, that the parts, so held respectively constitutional and unconstitutional, must be wholly independent of each other. But if they are so mutually connected with and dependent on each other, as conditions, considerations or compensations for each other, as to warrant a belief that the legislature

(1964). *Cf. Rutenberg v. City of Philadelphia*, 329 Pa. 26, 196 A. 73, 79 (1938) ("The test of severability may be stated in simple terms as follows: After the invalid portion of the act has been stricken out, whether that which remains is self-sustaining and is capable of separate enforcement without regard to that portion of the statute which has been cast aside. If this be true the statute should be sustained to the extent of that which remains.").

**39.** *Bank of Hamilton v. Lessee of Dudley*, 27 U.S. 492, 526, 2 Pet. 492, 526, 7 L.Ed. 496 (1829).

intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional or connected, must fall with them.

Nagle, *Severability*, 72 N.C. L. REV. at 212–13 (citing *Warren*, 68 Mass. 84, 2 Gray at 99) (footnotes omitted).

No doubt because the severance principle has its roots in a jurisprudential doctrine (and the standard itself reflects the experience of the common law), the courts have not treated legislative declarations that a statute is severable, or nonseverable, as "inexorable commands," but rather have viewed such statements as providing a rule of construction.

Nor is the fact that the ordinances contain a severability clause controlling. As stated by Mr. Justice Brandeis in *Dorchy v. The State of Kansas*, 264 U.S. 286, 44 S.Ct. 323, 68 L.Ed. 686 (1924), the clause "provides a rule of construction * * * in determining [legislative] intent. But it is an aid merely; not an inexorable command." As ruled by this Court in *Pennsylvania R.R. Co. v. Schwartz*, 391 Pa. 619, 139 A.2d 525 (1958), while a severability clause must be given due weight, it is not to be accepted judicially as conclusive if the unity of the general legislative scheme is completely destroyed by a severance of its provisions.

*Saulsbury v. Bethlehem Steel Co.*, 413 Pa. 316, 196 A.2d 664, 667 (1964) (additional U.S. Supreme Court citations omitted). *See also Pennsylvania Fed'n of Teachers v. School Dist. of Philadelphia*, 506 Pa. 196, 484 A.2d 751, 754 (1984) (holding nonseverability provision inapplicable where Act is unconstitutional only as applied to persons who were members of retirement system at time of the enactment, but constitutional as applied to those who became members of the retirement system subsequent to the effective date of the Act); *accord Louk v. Cormier*, 218 W.Va. 81, 622 S.E.2d 788, 803 (2005) ("[W]e now hold that a non-severability provision contained in a legislative enactment is construed as merely a presumption that the Legislature intended the entire enactment to be invalid if one of the statutes in the legislation is found uncon-

stitutional. When a non-severability provision is appended to a legislative enactment and this Court invalidates a statute contained in the enactment, we will apply severability principles of statutory construction to determine whether the non-severability provision will be given full force and effect."); *Stiens v. Fire and Police Pension Assoc.,* 684 P.2d 180, 184–85 (Colo.1984) (nonseverability clause, like severability clause "is not conclusive as to legislative intent" but "gives rise only to a presumption that, if the unconstitutional parts of an act were eliminated, the legislature would not have been satisfied with what remained"; ultimately holding that "the presumption of unseverability has been overcome"); *Legislative Research Commission v. Brown,* 664 S.W.2d 907, 919–20 (Ky.1984) (declining to enforce nonseverability clause because to do so would violate separation of powers, in that it would "unconstitutionally limit[ ] and interfere[ ] with the governor's mandated duties"); *Biszko v. RIHT Fin. Corp.,* 758 F.2d 769, 773 (1st Cir.1985) ("Although ... a non-severability clause cannot ultimately bind a court, it establishes a presumption of nonseverability.").

The willingness of courts to look behind legislative provisions concerning severability in appropriate cases apparently derives, at least in part, from a historical uneasiness with the notion that legislatures could dictate the conclusion of what had long been a judicial inquiry:

> The first severability clauses appeared late in the nineteenth century, and they became much more common around 1910. These clauses were a reaction to those courts that were aggressively holding statutes nonseverable. The earliest legislative statements that statutory provisions should be construed as being severable were taken at face value by the courts. But courts soon soured on express legislative statements concerning severability. State courts and commentators refused to accept the proposition that legislatures had authority to dictate to the courts the appropriate decision regarding severability.

Nagle, *Severability,* 72 N.C. L. REV. at 222 (footnotes omitted). The severability standard adopted in Section 1925's

presumption does not pose the historical issue Nagle describes because it is not a boilerplate directive. Instead, Section 1925 adopts the historical judicial standard which governed severability inquiries, and then statutorily mandates the Judiciary to make the ultimate determination of severability.

We have no doubt that the unconstitutional legislative unvouchered expense provision is severable from the remaining, valid (although now repealed) provisions of Act 44, under the substantive standard set forth in Section 1925. In Act 44, the General Assembly adopted a comprehensive new compensation system governing the three branches of government, a system which employed formulas tying the compensation paid Pennsylvania officials to that provided for corresponding federal officials, albeit in a stepped-down fashion. Insofar as the Act adopted the new compensation system for the legislative branch, that system could go into effect, without violating Article II, Section 8 of the Pennsylvania Constitution, with the commencement of the next term of office for each legislative seat. A major and new perceived benefit of this system of compensation consisted in the fact that, by tying salary to the federal structure, the issue of raising official compensation would be de-politicized. This new system of compensation, however, was not "essentially and inseparably connected with" the legislative unvouchered expense provision, much less did it "depend upon" that provision. See 1 Pa.C.S. § 1925. The remaining valid (but repealed) provisions are easily capable of being executed in accordance with the General Assembly's manifest intention of providing a new and permanent compensation structure for officials in all three branches of government. In contrast, the legislative unvouchered expense provision had nothing to do with the new, comprehensive compensation system. Instead, that provision sought to avoid a constitutional limitation particular only to the legislative branch, which cannot increase its own salary or mileage during the same legislative term in which such a law is passed. Whatever may have been the motivation behind the unvouchered expense provision, it is clear that the provision was not integral to the workings of the comprehensive

632

system of governmental compensation otherwise adopted in Act 44.

But, of course, the issue is not so simple because the General Assembly included in Act 44 a boilerplate nonseverability provision, which reads as follows:

> The provisions of this act are nonseverable. If any provision of this act or its application to any person or circumstance is held invalid, the remaining provisions or applications of this act are void.

Act 44, § 6. This nonseverability provision is unlike the general provision ensconced in Section 1925 in that it sets forth no standard for measuring nonseverability, but instead, simply purports to dictate to the courts how they must decide severability. If this nonseverability clause is not controlling, the unvouchered expense provision, as noted, can be severed from the remaining valid provisions of Act 44. If the nonseverability clause is controlling, however, and validly operates to dictate to the Judiciary the effect of a finding of unconstitutionality as to any individual provision in Act 44, then Act 44 would of necessity be invalidated in its entirety. In the latter instance, this Court would have to proceed to the Judges' claim that invalidation of the entirety of Act 44, and the attendant reduction of judicial compensation that action would entail, would violate Article V, Section 16(a) of the Pennsylvania Constitution.

- 2 -

While maintaining his primary argument that Act 44 violates the procedural provisions of Article III of the Pennsylvania Constitution, and therefore, the severability issue is moot, Stilp argues, in the alternative, that the nonseverability provision must be deemed to have no valid legal effect. Stilp submits that the General Assembly obviously included the nonseverability clause for the sole purpose of coercing the courts not to strike Act 44's unconstitutional legislative unvouchered expense provision: "The General Assembly shrewdly calculated that the courts would not want to jeopardize their own raise, but would instead look the other way...." Stilp's

Brief at 26. Stilp argues that the General Assembly's attempt to influence and control judicial consideration of the constitutionality of Act 44 and its individual provisions violates the separation of powers doctrine. Therefore, according to Stilp, if this Court were to find the unvouchered expense provision unconstitutional but the rest of the Act valid, the provision should be severed.

Turning to the question under Article V, Section 16(a) of the Pennsylvania Constitution, Stilp argues that if this Court were to strike down Act 44 in its entirety—either because of: (1) an Article III violation; or (2) striking down the unvouchered expense provision and then giving effect to the nonseverability provision—the prohibition on reducing judicial compensation would not be violated. This is so, Stilp contends, because striking the entirety of Act 44 as unconstitutional would render the Act void *ab initio;* and, as a result, the increase in compensation already received by the Judiciary would be deemed a legal nullity. In addition, Stilp argues that Article V, Section 16(a) would not be violated if this Court struck Act 44 because the reduction in judicial salaries would be a result of an act by this Court, and not a law passed by the General Assembly.

In his brief, Treasurer Casey does not address the validity of the nonseverability provision. Consistently with the arguments he forwards concerning the Article III issues, the Treasurer maintains that, because the manner of Act 44's passage violated Article III, it is void *ab initio* and the increase in judicial compensation it afforded must be deemed a nullity. Because no increase in compensation was lawfully provided to the Judiciary, the Treasurer argues, there is no violation of Article V, Section 16(a).[40]

The remaining appellees—Attorney General Corbett on behalf of the Commonwealth, Senator Jubelirer, and Speaker Perzel—counter that Act 44's nonseverability provision controls this Court's interpretation of the effect of a finding that any provision in Act 44 is unconstitutional. Appellees view

40. The Potts *amicus* brief echoes the arguments forwarded by Stilp and Treasurer Casey.

this Court's role as being limited to implementing the legislative directive. Appellees assert that the nonseverability clause merely reflects the General Assembly's intention that all provisions of Act 44 should be viewed as if they are interdependent, such that if any provision were struck, the overall purpose of the Act in providing for a comprehensive salary structure for all three branches of government is compromised. Appellees further contend that nonseverability provisions are not a means by which the legislative branch attempts to influence and usurp judicial power, and thus, such provisions do not violate the separation of powers. Each appellee, however, offers slightly differing reasons in support of these general arguments.

Attorney General Corbett initially asserts that, although the General Assembly's motives for including the nonseverability provision in Act 44 may indeed be "self-serving," judicial deference to the provision does not violate the Pennsylvania Constitution. Thus, in the Attorney General's view, a finding that any provision of Act 44 is unconstitutional requires this Court to hold that the remaining provisions of the Act are automatically void. This holding would result in the compensation allotted to all three branches of government returning to the levels authorized under the compensation system in effect before passage of Act 44. The Attorney General submits that this result would not violate Article V, Section 16(a) because the Judiciary would be treated the same as the other branches of government.

Senator Jubelirer submits that the nonseverability clause is constitutional and enforceable as it reflects the General Assembly's policy determination and manifest intention that Act 44 should be considered a unified piece of legislation that must be enforced in whole or not at all. The Senator contends that the inclusion of such a clause represents a binding legislative policy decision and, he insists, it is a proper exercise of legislative discretion that does not infringe upon powers entrusted to the Judiciary or the judicial function itself: "The inclusion of a nonseverability clause in legislation does not interfere with, restrain, coerce or diminish the judicial power

or dictate the decisions the court must make." Senator Jubelirer's Brief at 39. Thus, in the Senator's view, such a provision does not violate the separation of powers.

The Senator also argues that this Court has given effect to nonseverability clauses in prior cases. In support of this point, the Senator primarily cites to former Chief Justice Zappala's Opinion in Support of Affirmance ("OISA") in *Gmerek v. State Ethics Commission*, 569 Pa. 579, 807 A.2d 812 (2002). The *Gmerek* OISA, which represented the view of two Justices, would have found multiple provisions of the Lobbying Disclosure Act, 65 Pa.C.S. §§ 1303–1311, unconstitutional as violative of Article V, Section 10 of the Pennsylvania Constitution, and would have given effect to the Act's nonseverability provision and thus struck the entire act as invalid.[41] *See Gmerek*, 807 A.2d at 818–19 (Zappala, C.J., OISA, joined by Cappy, J.). The Senator further notes that his research uncovered only two cases where Pennsylvania nonseverability clauses were challenged on constitutional grounds, and in both instances the courts upheld the provision. *See Brookins v. O'Bannon*, 699 F.2d 648 (3d. Cir.1983) (nonseverability clause in legislation amending Pennsylvania Public Welfare Code held not to violate First Amendment rights of expression, petition, and association of Philadelphia Welfare Rights Organization or its members); *Kennedy*, 119 Pa.Cmwlth. 24, 546 A.2d 733 (nonseverability clause in 1987 compensation act upheld).

Senator Jubelirer further maintains that, if this Court were to find that the legislative unvouchered expense provision is unconstitutional, the nonseverability clause would render Act 44 void *ab initio*. Echoing the other parties, the Senator argues that, in such an instance, the increase in compensation afforded the Judiciary by operation of the Act 44 formulas must be deemed void, the repeal represented by Act 72 did

41. The nonseverability provision in the Lobbying Disclosure Act provided that, "If any provision of this chapter or its application to any person or circumstance is held invalid on the basis of improper regulation of the practice of law, the remaining provisions or applications of this chapter are void." 65 Pa.C.S. § 1311(b).

not diminish judicial compensation, and thus, there has been no violation of Article V, Section 16(a).

Speaker Perzel also argues that Act 44's nonseverability provision is constitutional and enforceable. The Speaker notes that the General Assembly has inserted similar provisions in scores of statutes, and has included partial nonseverability clauses in several other statutes.[42] The Speaker insists that the nonseverability provision included in Act 44 was not an attempt by the General Assembly to intrude upon the province of the Judiciary, but merely reflected a clear legislative intention that every provision of Act 44 be viewed as being mutually interdependent and, therefore, the Act was intended to be enforced *in toto*, or not at all. In addition, the Speaker suggests that the General Assembly inserted a nonseverability provision in Act 44 "as a clear expression that the complete review and overhaul of public officials' compensation in Pennsylvania was not intended to be done in any piecemeal fashion, but as an interrelated whole." Speaker Perzel's Brief at 33.

In his *amicus curiae* brief, Judge Herron submits that nonseverability clauses generally are constitutional, but contends that, if this Court were to strike down a provision of Act 44 as unlawful, enforcement of the nonseverability provision to invalidate the judicial compensation provisions would be unconstitutional under Article V, Section 16(a). In arguing the unconstitutionality of the nonseverability provision, Judge Herron contends that the General Assembly has no more power to repeal Act 44's formula which increased judicial compensation through an indirect, contingent method—inclusion of a nonseverability provision—than to directly reduce judicial compensation, as it attempted to do in regard to Act 72. Moreover, Judge Herron rejects Stilp's suggestion that Article V, Section 16(a), would not apply to a court's reduction of compensation pursuant to the enforcement of a nonsevera-

---

**42.** Partial nonseverability clauses purport to permit severability of some provisions of a statute, but require invalidation of the entire statute if other specific provisions are struck. As an example of a partial nonseverability provision, see the Gaming Act. *See* 4 Pa.C.S. § 1902; *PAGE*, 877 A.2d at 390 n. 3.

bility provision, contending that the constitutional prohibition against diminishing judicial compensation is not limited to any particular branch of government. Therefore, Judge Herron asserts, the nonseverability clause would be unconstitutional as applied to the formula for determining judicial compensation in Act 44, although it may be constitutionally enforced with respect to those provisions in Act 44 which increased compensation for future holders of legislative and executive offices. Such a distinction is proper, Judge Herron argues, because the Pennsylvania Constitution does not preclude the General Assembly from repealing compensation provisions respecting those branches of government.[43]

- 3 -

The issue of the enforceability of the nonseverability provision is not a question of legislative intent; the provision itself makes clear the legislative desire that no court invalidate a single provision of the Act without invalidating the whole. The question is whether and when the General Assembly may dictate the effect of a judicial finding that a provision in an act is "invalid." There is no controlling authority on this point. The *Gmerek* OISA, cited by both legislative appellees, was not a majority opinion and, in any event, merely would have applied the nonseverability provision without inquiring into its legitimacy. *See Gmerek*, 807 A.2d at 819 ("Given the explicit dictates of Section 1311(b) of the Act [regarding nonseverability], the entire Act must be declared invalid."). Likewise, although this Court in *Pennsylvania Fed'n of Teachers, supra*, declined to enforce a nonseverability provision, we did not discuss whether or when such provisions should be deemed binding. Moreover, the only Pennsylvania state appellate decision this Court has found which discusses a constitutional challenge to a nonseverability clause is *Kennedy, supra*, and that case is unhelpful to the present inquiry.[44]

**43.** Both the Brown appellants, in their *amici* brief, and the *amicus* brief filed by Thomas, Thomas and Hafer forward similar arguments to those offered by Judge Herron.

**44.** The Third Circuit's decision in *Brookins* is also unhelpful as the constitutional challenge there sounded in the First Amendment, and not

*Kennedy* involved comprehensive public official compensation legislation which was similar to Act 44 in that it increased the salaries of legislators, the Judiciary, and high-ranking executive officials, and contained a nonseverability provision worded identically to the nonseverability provision later found in Act 44. *See* The Act of July 3, 1987, P.L. 193, No. 28. The *pro se* appellants in *Kennedy,* a member of the Pennsylvania House and two private citizens, raised several claims, including a multi-pronged challenge to the nonseverability clause. The appellants challenged the provision on grounds that it: gave the Judiciary an interest in the statute because it linked an increase in judicial compensation to unvouchered expense allowances; effectively denied the appellants their right to legal representation because no attorney would likely represent a party challenging an act that included a raise in judicial compensation for fear of alienating the Judiciary; violated the spirit of Article III, Section 27 of the Pennsylvania Constitution; and was contrary to public policy, which presumes severability. The appellants did not explicitly claim, however, that the provision violated the separation of powers.

The Commonwealth Court *en banc* panel in *Kennedy* first held that the appellants were not denied access to the courts because they had in fact received judicial consideration of their claims.[45] The *en banc* panel then dismissed the appellants' public policy argument as unripe, noting that nonseverability was an issue only if another provision of the act was found to be unconstitutional, and that condition precedent was not satisfied because the *en banc* panel upheld the unvouchered expense provision which had been challenged. Finally, the *en banc* panel found the Article III, Section 27 challenge moot. The *Kennedy* court did not address the appellants' first argument—*i.e.,* that the nonseverability clause improperly tied the increase in judicial compensation to the legislative unvouchered expense provision—the claim that is most like the

the separation of powers. In addition, of course, decisions of the lower Federal courts do not bind this Court, and particularly where the question is one of state law.

**45.** The *en banc* panel did not address the appellants' claim that the provision operated to deny their right to legal representation.

separation of powers issue before the Court in the case *sub judice. Kennedy,* 546 A.2d at 738–39.

By definition, a legislative provision concerning severability or nonseverability exists only in anticipation of judicial review. In the ordinary case, a standard-less nonseverability clause is superfluous since the Legislature, once confronted with a judicial ruling that a provision of a statute is unconstitutional, may always revisit the subject anew, irrespective of whether the court deemed the unconstitutional provision severable. Such a practice leaves it to the legislative body to assess whether the statute, as affected by the judicial interpretation, is acceptable. Indeed, this practical fact may account for the relative rarity of nonseverability provisions. Having said this, for purposes of this appeal, we may assume that, as a general matter, nonseverability provisions are constitutionally proper. There may be reasons why the provisions of a particular statute essentially inter-relate, but in ways which are not apparent from a consideration of the bare language of the statute as governed by the settled severance standard set forth in Section 1925 of the Statutory Construction Act. In such an instance, the General Assembly may determine that it is necessary to make clear that a taint in any part of the statute ruins the whole. *See generally* Kameny, *Are Inseverability Clauses Constitutional?,* 68 ALB. L. REV. at 1000 (arguing that severability determinations are "guesswork by definition, and it is understandable for legislators to fear that the courts might guess wrong."). Or, there may be purely political reasons for such an interpretive directive, arising from the concerns and compromises which animate the legislative process. *See* Michael D. Shumsky, *Severability, Inseverability, and the Rule of Law,* 41 HARV. J. ON LEGIS. 227, 267–68 (2004) ("When [a legislature] includes an inseverability clause in constitutionally questionable legislation, it does so in order to insulate a key legislative deal from judicial interference."); Israel E. Friedman, *Comment, Inseverability Clauses in Statutes,* 64 U. CHI. L. REV. 903, 914 (1997) ("[I]nseverability clauses serve a key function of preserving legislative compromise;" they "bind[ ] the benefits and concessions that consti-

tute the deal into an interdependent whole."). In an instance involving such compromise, the General Assembly may determine, the court's application of the logical standard of essential interconnection set forth in Section 1925 might undo the compromise; a nonseverability provision, in such an instance, may be essential to securing the support necessary to enact the legislation in the first place. Once again, this is a concern that would not necessarily be apparent to a court analyzing the bare language of the statute.

On the other hand, this Court is not naïve, and we recognize that a nonseverability provision is a legislative practice that, in certain instances, may be employed as a sword against the Judiciary or the Executive, rather than as a shield to ensure preservation of a legislative scheme or compromise.[46] Where the provision appears to be aimed at securing a coercive effect upon the Judiciary, it necessarily implicates the separation of powers. Although there is little authority or commentary concerning nonseverability provisions (indeed, what commentary there is notes the lack of authority), those authorities to consider the matter have distinguished (and rightfully so, in this Court's view) between appropriate uses of nonseverability clauses and uses which are more problematic in light of separation of powers concerns. Kameny, whose point of departure was the Commonwealth Court's opinion in *Kennedy*, described the compensation statute and nonseverability provision at issue there as follows:

**46.** A nonseverability provision could also be employed, in conjunction with a relatively minor but constitutionally suspect provision in a bill, in the hope that the courts will strike down legislation that the legislative body did not truly support, but passed for reasons of political expediency. *See generally* Kameny, *Are Inseverability Clauses Constitutional?*, 68 ALB. L. REV. at 1001 ("The other questionable use of inseverability, a sort of poison-pill device . . . , involves an attempt to sabotage a statute. The legislators might assume that the statute contains some unconstitutional provision already . . . , or they might insert both an inseverability clause and a new provision whose unconstitutionality was fairly plain. . . . Such a clause can serve a dual purpose: it can ensure invalidation of the law, and at the same time legislators who oppose the bill in principle, but whose constituents favor it, can feel comfortable voting for the bill and gaining political advantage without concern that the bill might survive judicial scrutiny.").

Pay increases for government employees are never politically popular, but this bill seemed unremarkable—although one could question the propriety of having the increase in expense allowances take effect immediately, so that the legislators were in effect voting an increase for themselves. Yet the truly extraordinary feature of the bill was not the hint of self-dealing, but rather the way in which the legislators sought to clothe the self-dealing in protective garb. For the bill contained the following language: "The provisions of this act are nonseverable. If any provision of this act or its application to any person or circumstance is held invalid, the remaining provisions or applications of this act are void." The implications of this clause are inescapable: there was some question as to the constitutionality of having legislators increase their own expense allowances; the legislature foresaw that a constitutional challenge was possible; and the inseverability clause ensured that if a court struck down the increase in legislators' expense allowances, the increase in judicial salaries would be sacrificed as well.

Kameny, *Are Inseverability Clauses Constitutional?*, 68 ALB. L. REV. at 997–98. Kameny describes this use of a nonseverability provision as "serv[ing] an in terrorem function, as the legislature attempts to guard against judicial review altogether by making the price of invalidation too great." *Id.* at 1001. This sort of practice, he continues, is "especially troubling" because it "represent[s] an attempt by the legislature to prevent the judiciary from exercising a power that rightly belongs to it. . . . These clauses, in other words, amount to coercive threats." *Id. See also* Friedman, *Inseverability Clauses in Statutes*, 64 U. CHI. L. REV. at 919–20 (although nonseverability clauses should generally be honored and should be shown more deference than severability clauses, "courts' deference to the plain meaning of inseverability clauses should not be unlimited. If giving effect to an inseverability clause would result in overstepping the bounds of legislative or judicial authority, then the clause should not be followed."). *Accord Brown*, 664 S.W.2d at 920 (declining to enforce nonseverability clause because "[t]he restriction placed on the execu-

tive by [the nonseverability clause] effectively and unconstitutionally limits and interferes with the governor's mandated duties.").

As we have noted above, this Court has never deemed nonseverability clauses to be controlling in all circumstances. And, in the case *sub judice*, given the separation of powers concerns that arise from inclusion of the clause in a statute such as Act 44, which includes compensation provisions for the Judiciary, we hold that the clause is ineffective and cannot be permitted to dictate our analysis. Although we have confidence that no member of the Pennsylvania Judiciary in a position to pass upon the statute in fact would allow the effect of the clause to influence the analysis of any constitutional challenge, the fact remains that the clause, if deemed effective, acts as an incentive to engage in a less exacting constitutional inquiry. As the *Jorgensen* Court noted, in discussing the importance of the separation of powers, "[r]etribution against the courts for unpopular decisions is an ongoing threat." 811 N.E.2d at 660. In this case, the potential "retribution" is built into the statute itself in the would-be automatic effect of the nonseverability provision. It is improper, to say the least, for the Legislature to put a coequal branch of government in such a position. Whether this effect is the sole or primary purpose of the nonseverability provision, and whether it is entirely deliberate, is of less importance than the fact of its existence in such legislation, and the obvious influence such a provision might be designed to exert over the independent exercise of the judicial function.[47] In a case such as this, we conclude, enforcement of the clause would intrude upon the indepen-

---

**47.** As Justice (later Chief Justice) Maxey noted in *Com. ex rel. Smillie v. McElwee*, 327 Pa. 148, 193 A. 628, 633 (1937):

This court said in *Appeal of City of Scranton School District*, 113 Pa. 176, 190, 6 A. 158, 160 [1886]: "Attempts, in covert modes, to defeat its [the Constitution's] plain provisions, must be set aside with the same certainty as when the methods are open." The act now before us is a legislative usurpation of power. In placing it on the statute books the Legislature stepped beyond the landmarks established by the Constitution and what it did when thus "out of bounds" is of no validity. "There is no position which depends upon clearer principle than that every act of a delegated authority contrary to the tenor of its commission is void." (Alexander Hamilton in the "Federalist".).

dence of the Judiciary and impair the judicial function.[48] Accordingly, we will not enforce the clause but instead we will effectuate our independent judgment concerning severability.[49] Therefore, and consistently with our severability analysis above, we hold that the unvouchered expense provision, which plainly and palpably violates Article II, Section 8 of the Pennsylvania Constitution, is severable from the otherwise-constitutionally valid remainder of Act 44.[50]

## IV. CONCLUSION AND MANDATE

**A.** We hold that Act 72's repeal of Act 44 clearly, palpably, and plainly violates Article V, Section 16(a) of the Pennsylvania Constitution insofar as it reduces the judicial compensation that resulted from the formula adopted by Act 44, compensation which the Judiciary began to receive in July of 2005. We also find that the unconstitutional provision is severable from the remainder of the Act. Accordingly, we enjoin Act 72 in

**48.** We find further support for our conclusion in the fact that none of the arguments in favor of enforcing this nonseverability provision offer any persuasive explanation of how it served some benign legislative purpose other than to attempt to influence and burden judicial review. For example, Speaker Perzel suggests that the provision merely shows that the General Assembly sought to ensure a "complete review and overhaul of public officials' compensation" and not to tackle the task in "piecemeal fashion." But the unvouchered expense provision obviously was not necessary to the comprehensive overhaul itself; that was already complete. Moreover, it is notable that here, unlike in *PAGE*, for example, the General Assembly included a global and boilerplate nonseverability provision, and not a partial, targeted, or specific one.

**49.** Mr. Justice Saylor suggests that, unless this Court expressly overrules the approach in *Consumer Party*, we should apply a similar level of deference respecting the nonseverability provision as the *Consumer Party* Court applied to Act 39's adoption of mid-term unvouchered expenses. But, as we have noted, our reaffirmation of the rational relationship rule in *Consumer Party* does not encompass reaffirmation of the application of that test, including the level of deference shown. More importantly and fundamentally, we do not believe that there is an equivalence between deference to legislative judgment concerning the manner of defraying and accounting for legislative expenses, and deference to a legislative attempt to dictate to the Judiciary the interpretation of a statute addressing the subject of judicial compensation.

**50.** In light of our conclusion, we need not address the Judges' contingent claim that enforcement of the clause would violate Article V, Section 16(a) of the Pennsylvania Constitution.

part. The effect of our finding that the Act 72 repeal is ineffective in this limited respect is that Act 44's provisions amending 42 Pa.C.S. §§ 1801–1809, which relate solely to the formula to determine compensation paid to the Judiciary, remain in force.

**B.** We will not reach Speaker Perzel's argument concerning the provision in Act 44 which establishes a new cost-of-living formula for future judicial compensation. *See* Act 44, § 1 (amending 42 Pa.C.S. § 1810). We make no determination because the issue is not properly before us, the parties were not asked to brief it, and it is speculative whether such an issue will ripen.

**C.** Turning to Act 44, we find that Stilp's Article III challenges to the legislation lack merit, and the presumption of constitutionality controls.

**D.** However, we find merit in Stilp's claim that Act 44's provision respecting mid-term unvouchered expense allowances to members of the General Assembly, *see* Act 44, § 2 (amending 46 Pa.C.S. § 1107), is unconstitutional as violative of Article II, Section 8 of the Pennsylvania Constitution. We also agree with Stilp that the nonseverability provision in Act 44 is unenforceable in light of separation of powers concerns. Accordingly, we hold that this unconstitutional provision is severed from the remainder of Act 44.

**E.** Finally, we turn to remedy. We note that this Court did not draft or play any role in the enactment of the legislation that became Act 44. That legislation, passed by the General Assembly and duly signed by the Governor, set the compensation judges were to receive, and in July of 2005 the Judiciary began receiving that compensation, only to have the compensation unconstitutionally reduced by Act 72.

The Constitution of Pennsylvania mandates that the Judiciary shall be compensated as provided by law. To effectuate that constitutional command, we order that the Treasurer of the Commonwealth: (1) shall forthwith calculate judicial compensation in accordance with Act 44, as explained in this Opinion; and (2) shall, upon receipt of vouchers prepared by

the Administrative Office of Pennsylvania Courts, reimburse members of the Judiciary for the unconstitutional diminution in compensation effected by Act 72. It is so ordered.

Justice NEWMAN, Justices EAKIN, BAER and BALDWIN join in this opinion.

Chief Justice CAPPY did not participate in the consideration or decision of this matter.

Justice SAYLOR files a concurring and dissenting opinion.

Justice SAYLOR concurring and dissenting.

I join the majority's holding and reasoning that the Legislature's attempt, via Act 72, to repeal Act 44's compensation plan is unconstitutional as it relates to the salaries of judicial officers, since the enactment plainly reduces those salaries during judicial terms of office, and therefore, violates Article V, Section 16(a) of the Pennsylvania Constitution. I also agree that Act 44's mid-term "unvouchered expense" allocations violated Article II, Section 8 of the Pennsylvania Constitution, in that they facially represented an unconstitutional mid-term salary increase for legislators. My primary point of difference with the majority concerns the decision to negate the application of Act 44's non-severance provision in the circumstances as they have unfolded, thereby resuscitating judicial salary increases that are otherwise a component of void legislation.

On this severance question, I also agree with much of the majority's able reasoning. Indeed, writing on a clean slate, I would join its approach in discerning too great a possibility that Act 44's non-severance provision was employed tactically (to create a disincentive to the issuance of an adverse ruling upon any Act 44 challenge), and in invoking the separation-of-powers doctrine to invalidate the non-severance clause. In this regard, I also agree that, although Act 44's non-severance clause is entitled to a presumption of constitutionality in the first instance, it need not be regarded as an inexorable command.

On the other hand, I believe that this Court's decision in *Consumer Party of Pennsylvania v. Commonwealth*, 510 Pa. 158, 507 A.2d 323 (1986), served a substantial role in the events that led to the insertion of the unconstitutional, mid-term, "unvouchered expense" allocation into Act 44. Certainly, I appreciate that the unvouchered allotment that was at issue in *Consumer Party* is distinguishable from Act 44's formula-based, dollar-for-dollar image of a next-term salary increase. *See* Majority Opinion, at 618–22, 905 A.2d at 966–67. Nevertheless, it is my considered perspective that the $5,000 unvouchered allocation at issue in *Consumer Party* (constituting approximately one-fifth of legislators' then-prevailing salary rate, payable over and above ordinary expense allowances) represented too great a non-transparent conveyance to pass even the loose reasonable relation test that the Court applied in assessing its constitutional validity.[1] As the majority relates, the decision subsequently has been taken to its logical extreme in the enactment and defense of further mid-term, unvouchered allotments couched as expenses that were a dollar-for-dollar match for next-term salary increases. *See Stilp v. Commonwealth*, 699 A.2d 1353 (Pa.Cmwlth.1997); *Kennedy v. Commonwealth*, 119 Pa.Cmwlth. 24, 546 A.2d 733 (1988).[2]

1. The excessive deference embodied in *Consumer Party's* approach is reflected, for example, in an expressed lack of concern regarding whether the unvouchered allotments couched as expenses were reported by legislators as income or expenses on federal tax returns. *See Consumer Party*, 510 Pa. at 185–86 n. 17, 507 A.2d at 337 n. 17.

2. While the majority does not expressly disavow *Consumer Party*, there is discord between the high degree of deference accorded to the legislation authorizing "unvouchered expenses" in *Consumer Party*, 510 Pa. at 184–87, 507 A.2d at 336–38, and the stricter scrutiny that the majority applies presently in looking behind the facial terms of the non-severance provision to its potential underlying impetus. *See* Majority Opinion, at 635–38, 905 A.2d at 976–78.

Indeed, to the extent that the approach in *Consumer Party* is not expressly overruled here, it seems to me that the proper course would be to apply a similar measure of deference to Act 44's non-severance clause as was previously applied to "unvouchered expenses." With *Consumer Party* as the litmus, in which the Court referenced a dearth of actual evidence of improper purposes on the part of the Legislature and refused to look behind obviously problematic legislation on its own, *see Consumer Party*, 510 Pa. at 186–87, 507 A.2d at 337–38, it appears that

The overly deferential approach employed in the *Consumer Party, Kennedy*, and *Stilp* decisions appears to have fostered the unfortunate appearance of the courts' imprimatur upon the "unvouchered expense" method of circumventing Article II, Section 8. Simply put, *Consumer Party's* approach to mid-term "unvouchered expenses" left open too substantial an opportunity for further erosion of the constitutional prohibition, which, unfortunately, has continued in the aftermath, most recently in Act 44. Compounding this, the present case involves a situation in which members of the judiciary are called upon to adjudicate a matter touching on their personal financial interests under the rule of necessity. *See* Majority Opinion, at 556–59, 905 A.2d at 928–29. Against this landscape, it does not seem to me that the Court can sufficiently guard against all appearances of self-interest and/or involvement, while acting to negate an expression of legislative will (namely, Act 44's non-severance clause) to maintain any part of the tainted Act 44 legislation.[3]

In summary, because I believe that *Consumer Party* was wrongly decided, I would expressly overrule the decision. Since, moreover, I cannot support the invalidation of Act 44's non-severance clause in the circumstances as they have unfolded, I would deem the enactment void as of its inception. For that reason, I would also hold that the salary status quo for judicial officials affected by Act 44 should be maintained at the pre-Act 44 levels, as was otherwise accomplished by Act 72.

---

Act 44's non-severance provision would also readily pass review. In this regard, there is also no actual evidence of improper purposes here—the majority applies a reasonable inference of an intention to intrude into the judicial function. *See* Majority Opinion at 635–38, 905 A.2d at 976–78. Again, however, such inferences were no part of the *Consumer Party* decision.

3. In this regard, I would emphasize that my position is not that the Court should act in and of its own accord to invalidate Act 44's compensation plan as it relates to judicial officers. Rather, I believe that the Court should simply not disturb the express directive of the Legislature that the entire compensation plan must fall should any provision of Act 44 be deemed invalid.